# United States Court of Appeals

Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

**Thomas K. Kahn**
Clerk

In Replying Give Number
Of Case And Names of Parties

December 28, 1999

Clarence Maddox
Clerk, U.S. District Court
301 N. Miami Avenue
Miami  FL  33128



FILED by ___ D.C.
RECORDS

JAN 0 3 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

RE: 97-5121 -BB      Mendoza v. Borden, Inc.
DC DKT NO.:  96-01082 CV-LCN

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

Also enclosed are the following:
  Bill of Costs
  Original Exhibits, consisting of two folders
  Original record on appeal or review, consisting of four records

Please acknowledge receipt on the enclosed copy of this letter.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Lisa Hester (404) 335-6134

Encl.

MDT-1 (1-1999)

# ED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
## BILL OF COSTS

Mendoza

_____
                    Appellant

vs.

Borden, Inc.

_____
                    Appellee

Case No. 97-512

```
FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

NOV 26 1999

THOMAS K. KAHN
CLERK
```

Fed.R.App.P. 39 and 11th Cir. R. 39-1 (see reverse) govern costs which are taxable in this court and the time for filing the Bill of Costs. A motion for leave to file out of time is required for a Bill of Costs not timely received.

## INSTRUCTIONS

In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced. Multiply this number by the cost per copy ( $.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| DOCUMENT | Repro. Method (Mark One) | | No. of Original Pages | Total No. Documents Reproduced | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
|---|---|---|---|---|---|---|---|
| Panel | In-House | Comm* | | | | | |
| Appellant's Brief | X | | 27 | 15 | 405 | $ 60.75 | |
| Record Excerpts | | | | | | | |
| Appellee's Brief | X | | | | | | $60.75 |
| Reply Brief | | | | | | | |
| Appellee's En Banc Brief | X | | 25 | 18 | 450 | 67.50 | $67.50 |
| *Note: If reproduction was done commercially, receipt(s) must be attached. | | | | | TOTAL | $ 128.25 REQUESTED | $ 128.25 ALLOWED |

I hereby swear or affirm that the costs claimed were actually and necessarily incurred or performed in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Date Signed: 11/23/99

Attorney for: Borden, Inc.
            (Type or print name of client)

Signature: Wesley R. Parson
           Wesley R. Parsons

---

**FOR COURT USE ONLY**

Costs are hereby taxed in the amount of $ 128.25 against Plaintiff-Appellant

and are payable directly to Defendant-Appellee

A True Copy - Attested
Clerk, U.S. Court of Appeals
Eleventh Circuit

By
Deputy Clerk
Atlanta, Georgia

Issued on: DEC 28 1999

Thomas K. Kahn, Clerk

By: Catherine D. Hester
    Deputy Clerk

MISC-12
(Rev. 12/98)

# United States Court of Appeals
## For the Eleventh Circuit

---

No. 97-5121

---

District Court Docket No. 96-CV-1082

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

NOV 16 1999

THOMAS K. KAHN
CLERK

RED MENDOZA,

Plaintiff-Appellant,

versus

BORDEN, INC., d.b.a. Borden's Dairy,

Defendant-Appellee.

A True Copy - Attested:
Clerk, U.S. Court of Appeals
Eleventh Circuit

Deputy Clerk
Atlanta, Georgia

---

Appeal from the United States District Court
for the Southern District of Florida

---

Before ANDERSON, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL and MARCUS, Circuit Judges.*

JUDGMENT

This cause came to be heard on defendant-appellees' rehearing en banc;

UPON CONSIDERATION WHEREOF, it is now hereby ordered and adjudged by this Court that the judgment of the said District Court in this cause be and the same is hereby AFFIRMED;

It is further ordered that plaintiff-appellant pay to defendant-appellee, the costs on appeal to be taxed by the Clerk of this Court.

---

*Judge Charles R. Wilson was appointed after this case was orally argued en banc, but is an active member of the court at the time the case is decided.  He has elected not to participate in the decisional process.

TJOFLAT, concurred in part and dissented in part and filed an opinion in which BIRCH, BARKETT and MARCUS, Circuit Judges, joined.

EDMONDSON, Circuit Judge, concurred and filed an opinion.

CARNES, Circuit Judge, concurred and filed an opinion.

BARKETT, Circuit Judge, concurred in part and dissented in part and filed an opinion, in which BIRCH, Circuit Judge, joined.

Entered: November 16, 1999

For the Court: Thomas K. Kahn, Clerk

By: _____

Deputy Clerk

ISSUED AS MANDATE:   DEC 2 8 1999

MENDOZA v. BORDEN, INC.

529

**CORRECTED ORIGINAL**

Red MENDOZA, Plaintiff-Appellant,

v.

BORDEN, INC., d.b.a. Borden's Dairy, Defendant-Appellee.

No. 97-5121.

United States Court of Appeals, Eleventh Circuit.

Nov. 16, 1999.

Former employee brought action against former employer alleging violations of Age Discrimination in Employment Act (ADEA), Americans with Disabilities Act (ADA), Title VII, and state anti-discrimination law, as well as intentional infliction of emotional distress. The United States District Court for the Southern District of Florida, No. 96-1082-CV-LCN, Lenore C. Nesbitt, J., entered summary judgment for former employer as to ADEA, Title VII retaliation, and state-law claims, and entered judgment as matter of law for employer as to remaining claims. Former employee appealed. The Court of Appeals, Hull, Circuit Judge, held that: (1) conduct alleged by employee, including, inter alia, supervisor's "constant" following and staring at employee, did not reach level of severe or pervasive conduct sufficient to alter employee's terms or conditions of employment, thus defeating hostile environment sexual harassment claim, and (2) district court properly granted summary judgment and judgment as a matter of law on employee's state-law claims and claims for age discrimination, disability discrimination, and retaliation.

Affirmed.

Edmondson, Circuit Judge, filed concurring opinion.

Carnes, Circuit Judge, filed concurring opinion.

Barkett, Circuit Judge, filed opinion concurring in part and dissenting in part, in which Birch, Barkett and Marcus, Circuit Judges, joined.

Tjoflat, Circuit Judge, filed opinion concurring in part and dissenting in part, in which Birch, Barkett and Marcus, Circuit Judges, joined.

Opinion, 180 F.3d 1171, vacated.

**FILED U.S. COURT OF APPEALS ELEVENTH CIRCUIT**

**NOV 1 6 1999**

1. Civil Rights ⚖167

In sexual harassment cases, courts must consider the alleged conduct in context and cumulatively. Civil Rights Act of 1991, § 102(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

2. Federal Courts ⚖776

Court of Appeals reviews de novo a district court's denial of a motion for judgment as a matter of law. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

3. Federal Courts ⚖798, 801

In reviewing district court's denial of a motion for judgment as a matter of law, Court of Appeals employs same standard the district court applied, reviewing all evidence in light most favorable to, and with all reasonable inferences drawn in favor of, nonmoving party. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

4. Federal Civil Procedure ⚖2146, 2152

Although existence of genuine issue of material fact precludes judgment as a matter of law, jury question does not exist because of the presence of a mere scintilla of evidence, and motion for judgment as matter of law will be denied only if reasonable and fair-

Synopsis, Syllabi and Key Number Classification
COPYRIGHT © 1999 by WEST GROUP

The Synopsis, Syllabi and Key Number Classification constitute no part of the opinion of the court.

minded persons in the exercise of impartial judgment might reach different conclusions. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**5. Federal Civil Procedure 🔑2142.1, 2152**

On motion for judgment as a matter of law, court must consider whether evidence presents a disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law, and, if facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion is properly granted. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**6. Civil Rights 🔑389**
**Federal Civil Procedure 🔑2497.1**

Though claims of employment discrimination, including sexual-harassment claims, present fact-intensive issues, motions for summary judgment or judgment as a matter of law are appropriate to police the baseline for hostile environment claims. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**7. Civil Rights 🔑167**

To establish hostile-environment sexual-harassment claim under Title VII based on harassment by a supervisor, employee must show: (1) that he or she belongs to a protected group; (2) that employee has been subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that harassment was based on the sex of the employee; (4) that harassment was sufficiently severe or pervasive to alter terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding employer liable.

Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**8. Civil Rights 🔑167**

Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal "civility code," and sexual harassment constitutes sex discrimination only when the harassment alters terms or conditions of employment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**9. Civil Rights 🔑167**

The paradigm of sexual harassment as federally prohibited employment discrimination occurs when employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compliance with employer's sexual demands. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**10. Civil Rights 🔑167**

Absent "explicit" discrimination with respect to terms or conditions of employment, employee must make some showing in order to connect allegations of sexual harassment to a violation of Title VII, and, thus, in cases traditionally described as hostile-environment cases, employer's harassing actions toward an employee do not constitute employment discrimination under Title VII unless the conduct is sufficiently severe or pervasive to alter conditions of victim's employment and create abusive working environment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**11. Civil Rights 🔑167**

Establishing that sexually harassing conduct was sufficiently severe or pervasive to alter employee's terms or conditions of employment includes a subjective and an ob-

jective component, such that employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable; environment must be one that a reasonable person would find hostile or abusive and that victim subjectively perceives to be abusive. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**12. Civil Rights 🔑167**

Objective severity of sexual harassment should be judged from perspective of a reasonable person in the plaintiff's position, considering all the circumstances. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**13. Civil Rights 🔑167**

Factors that should be considered in determining whether sexual harassment objectively altered employee's terms or conditions of employment include (1) frequency of the conduct; (2) severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with employee's job performance; courts should examine the conduct in context, not as isolated acts, and determine under totality of circumstances whether the harassing conduct is sufficiently severe or pervasive to alter terms or conditions of plaintiff's employment and create hostile or abusive working environment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**14. Civil Rights 🔑167**

Conduct alleged by female employee, including one instance in which supervisor said to employee "I'm getting fired up," one occasion in which supervisor rubbed his hip against employee's hip while touching her

shoulder and smiling, two instances in which supervisor made sniffing sound while looking at employee's groin area and one "instance of sniffing without looking at her groin, and supervisor's "constant" following and staring at employee in a "very obvious fashion," did not reach level of severe or pervasive conduct sufficient to alter employee's terms or conditions of employment, thus defeating hostile environment sexual harassment claim. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**15. Civil Rights 🔑167**

To establish that harm alleged was based on her sex, sexual harassment plaintiff must show that but for the fact of her sex, she would not have been the object of harassment. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

**16. Civil Rights 🔑158.1**

Purpose of Title VII is to strike at disparate treatment of men and women. Civil Rights Act of 1964, § 701 et seq, 42 U.S.C.A. § 2000e et seq.

**17. Civil Rights 🔑389**

Female employee's testimony about supervisor's "constant" following and staring did not create jury issue on employee's sexual-harassment claim, where there was no allegation of any staring or following employee outside the workplace or of calling her after work, employee admitted that supervisor never followed her in office part of the plant where employee worked and spent most of her time, and employee did not describe supervisor's following and staring as intimidating or threatening. Civil Rights Act of 1964, § 703(a)(1), 42 U.S.C.A. § 2000e-2(a)(1).

532

## MENDOZA v. BORDEN, INC.

Appeal from the United States District
Court for the Southern District of Florida.

Before ANDERSON, Chief Judge, and
TJOFLAT, EDMONDSON, COX, BIRCH,
DUBINA, BLACK, CARNES, BARKETT,
HULL and MARCUS, Circuit Judges.*

HULL, Circuit Judge:

This appeal requires this Court to deter-
mine whether Appellant Red Mendoza intro-
duced sufficient evidence at trial to support
her claim alleging hostile-environment sexual
harassment. We conclude that she did not,
and therefore we hold that the district court
properly granted Appellee Borden's Rule
50(b) motion for judgment as a matter of law
on Mendoza's sexual-harassment claim.[1]

I.  *Procedural History*

In April 1997, Mendoza filed a complaint in
the United States District Court for the
Southern District of Florida against Borden
alleging a variety of employment claims.
Mendoza asserted claims for age discrimina-
tion under the Age Discrimination in Em-
ployment Act ("ADEA"), disability discrimi-
nation under the Americans with Disabilities
Act ("ADA"), retaliation under Title VII, and
sexual harassment under Title VII. Mendoza
also asserted state-law claims alleging inten-
tional infliction of emotional distress and dis-
crimination in violation of the Florida Civil
Rights Act.

---

* Judge Charles R. Wilson was appointed after this
case was orally argued en banc, but is an active
member of the Court at the time the case is
decided. He has elected not to participate in the
decisional process.

[1] All judges concur in the majority opinion's
disposition of Mendoza's claims for age and dis-
ability discrimination, retaliation, and under
state law. The opinion for the Court on her

Following discovery, Borden moved for
summary judgment on all claims. After
hearing oral argument, the district court
granted summary judgment to Borden on all
of Mendoza's claims except her sexual-
harassment and disability-discrimination
claims.

The parties then proceeded to a jury trial.
Following the conclusion of Mendoza's case
in chief, the district court granted judgment
as a matter of law to Borden on her remain-
ing claims including Mendoza's hostile-envi-
ronment sexual-harassment claim.

Mendoza appealed the district court's or-
ders awarding summary judgment to Borden
on her ADEA, retaliation, and state-law
claims and the district court's order granting
Borden judgment as a matter of law on
Mendoza's sexual-harassment and ADA
claims. A panel of this Court affirmed the
district court's summary-judgment rulings
and the entry of judgment as a matter of law
on the ADA claim, but reversed the district
court's ruling on Borden's motion for judg-
ment as a matter of law on Mendoza's sexual-
harassment claim. *Mendoza v. Borden, Inc.,*
158 F.3d 1171 (11th Cir. 1998). On Borden's
suggestion for rehearing en banc, this Court
voted to hear the case en banc, vacated the
panel's opinion, and subsequently directed
the parties to brief issues related to Mendo-
za's sexual-harassment claim. *Mendoza v.
Borden, Inc.,* 169 F.3d 1378 (11th Cir. 1999).

We agree with the panel that the district
court properly granted Borden's motions

sexual harassment claim is joined in full by Chief
Judge Anderson and Judges Edmondson, Cox,
Dubina, Black, and Carnes. Regarding her sexu-
al harassment claim, Judges Tjoflat and
Carnes also file separate concurring opinions;
Judge Tjoflat files a dissenting opinion, in which
Judges Birch, Barkett, and Marcus join; Judge
Barkett files a dissenting opinion, in which Judge
Birch joins.

---

## MENDOZA v. BORDEN, INC.

533

for summary judgment and judgment as a
matter of law on Mendoza's claims for age
discrimination, disability discrimination, re-
taliation, intentional infliction of emotional
distress, and discrimination in violation of
the Florida Civil Rights Act. Therefore, we
affirm the district court's entry of judgment
in favor of Borden on Mendoza's claims for
age discrimination, disability discrimination,
retaliation, and Mendoza's state-law claims.
However, we disagree with the panel's con-
clusion on Mendoza's sexual-harassment
claim. For the reasons below, we conclude
that the district court did not err in grant-
ing Borden's motion for judgment as a mat-
ter of law on Mendoza's sexual-harassment
claim.

[1]   In sexual harassment cases, the
courts must consider the alleged conduct in
context and cumulatively. Therefore, we set
forth all alleged harassing conduct so that we
can look at the totality of the circumstances.
At trial, Mendoza testified to these instances
of conduct by Page. First, she testified that:

following me around and looking at me up
and down, whether it was face to face with
me or as I would get up from a lunch table
or from the picnic table to walk away and
to go back to the office.

Later, Mendoza further explained Page's
conduct:

He seemed to be wherever I was in the
plant. He followed me not around the
office, but around the hallways in the
Plant. Okay. If he was at a lunch table in
the lunch room. He would be at a picnic
table outside. And he would look me up
and down, very, in a very obvious fashion.
When I was face to face with him, when I
would get up and walk away from these
tables or areas, I would feel him watching
me up and down from—okay.

Finally, Mendoza reiterated that Page's fol-
lowing and watching "was a constant thing"
and that Page never said anything during the
following and watching.

Mendoza also testified about two instances
when Page "looked at me up and down, and

II.  *Factual Background*

Mendoza worked in Borden's Miami facili-
ty for a total of sixteen months. In Decem-
ber 1993, Mendoza began work with Borden
as a temporary employee in the accounting
department. In April 1994, she became a
permanent employee. Her employment end-
ed in April 1995. According to Borden, Men-
doza's employment ended because she was
absent from work for three consecutive days
without calling to explain her absence as
required by Borden's written personnel poli-
cies.

During most of her tenure with Borden,
Mendoza's supervisor was Daniel Page. He
began working in the Miami facility in May
1994; and therefore, his employment over-
lapped with Mendoza's. As the controller of the Mia-
mi facility, Page was the highest ranking
Borden employee at the facility. Thus, Page
exercised supervisory authority over Mendo-
za.

The Miami facility where Mendoza worked
consisted of several discrete areas. The

plant where the milk was processed consti-
tuted the majority of the facility, but the
facility also included various offices, hallways,
and an outdoor picnic area. Mendoza
worked in the same office area with eight to
twelve other accounting clerks. Page
worked in a glass-enclosed office situated in
one corner of that office area. From his
desk, Page could observe the rest of the
office area.

534    MENDOZA v. BORDEN, INC.

stopped in my groin area and made a ... sniffing motion.' Mendoza described these two instances as follows:

> There was an incident where I was standing at ... a copy machine direct right next to his office. I was making copies. I felt somebody watching me. I looked directly to my right. *He was sitting at a chair in the conference room, which is approximately 25, 25 feet away from me,* and at a chair at the end of the table. And he looked at me up and down, and stopped in my groin area and made a (indicating) sniffing motion.
>
> This also happened another time. It had to be in March, I had the flu. I went *into his office—he was sitting at his computer*—to tell him that my doctor wanted me to take time off because of this flu. And he turned around to his right, looked directly at me, up and down, and stopped again in the groin area, made a sniffing motion again, (indicating), like that.

(Emphasis supplied.) In one instance, Page was twenty to twenty-five feet away from Mendoza, and in the other, Page was sitting at his computer when Mendoza entered his office. She further testified to one other time when he walked around her desk and sniffed without looking at her groin. Mendoza admitted that Page *also never said anything to her* during what she perceived to be the sniffing nor the looking up and down.

Explaining her only allegation that included any physical conduct, Mendoza testified that while she was at a fax machine in a hallway, Page passed by her and "rubbed his right hip up against my left hip" while touching her shoulder and smiling. Mendoza's complete description of this follows:

> I was doing a fax. We had a small coffee machine directly outside the office to the right of our office. I was doing a fax. And this was—the fax machine was by the doorway, and he rubbed—he went by me and he rubbed his right hip up against my left hip. I was at an angle, rubbed against me, touched my shoulders at the same time, simultaneously. I was startled, I looked up, and he gave me a big smile.

When asked if Page said anything at that point, Mendoza testified, "No, he didn't." Mendoza also explained that this was the only physical contact during the eleven months she worked for Page. Finally, Mendoza described an incident when she confronted Page by entering his office and saying "I came in here to work, period?" According to Mendoza, Page responded by saying, "Yeah, I'm finally fired up, too."² When asked if Page said anything else during that meeting, Mendoza testified, "No, he didn't." Mendoza also admitted that this was the only time where Page said anything to her that she perceived to be of a sexual nature. When asked if "Page ever use[d] vulgar language with you?" Mendoza replied, "No, he didn't."³

2. The jury trial began with opening statements at 1:13 P.M. on May 13 and concluded on May 14 by 10:15 A.M. Mendoza's entire testimony covers seventy-nine pages, but her direct and cross examination about Page's conduct covers twenty-four pages. Since her testimony is fairly brief, we are able to quote her exact descriptions of Page's conduct in order to assure full consideration of Mendoza's allegations cumulatively and in context. Besides Mendoza, only one other witness testified at trial: Jenny Voltapelli,
who is married to Mendoza's dentist, testified that during several denial appointments, Mendoza related to her that she was being sexually harassed at work. Voltapelli did not recall the details that Mendoza related.

3. Although Page never used vulgar language with her, Mendoza did testify that other workers did. The example Mendoza gave was Ms. Diaz's being harassed at work. Voltapelli did not recall the details that Mendoza related

535    MENDOZA v. BORDEN, INC.

At the close of Mendoza's evidence, Borden moved for judgment as a matter of law on Mendoza's hostile-environment sexual-harassment claim. After hearing argument from counsel, the district court, ruling from the bench, granted Borden's motion. The court found the incidents of harassment "in the minds of a reasonable juror or to a reasonable person, are not physically threatening or humiliating, and certainly there was not a sufficient frequency and severity to suggest a hostile or abusive environment." The court further remarked that the allegations were largely devoid of any physical contact or overtly offensive comments. Accordingly the district court concluded that, assuming Mendoza's allegations were sexual in nature, Mendoza had not established a hostile or abusive work environment.

III. *Standard of Review and Standard for Granting Judgments as a Matter of Law*

[2–5] This Court reviews de novo a district court's denial of a motion for judgment as a matter of law. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997), cert. denied sub nom. *Combs v. Meadowcraft Co.,* ___ U.S. ___, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). We employ the same standard the district court applied, "reviewing[] all of the evidence in the light most favorable to the [non-moving] party, and with all reasonable inferences drawn in favor of, the nonmoving party." *Walker v. NationsBank of Florida, N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995). Although the existence of a genuine issue of material fact precludes judgment as a matter of law, "a jury question does not exist because of the presence of a 'mere scintilla of evidence'; ... A motion for judgment as a matter of law will be denied only if 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different

conclusions." *Id.* These standards require us to consider: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Combs,* 106 F.3d at 1526 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted." *Combs,* 106 F.3d at 1526 (quoting *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir. 1989)).

[6] We recognize that claims of employment discrimination, including sexual-harassment claims, present fact-intensive issues. However, we agree with the Fifth Circuit's observation that motions for summary judgment or judgment as a matter of law are appropriate to "police the baseline for hostile environment claims." *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264 n. 8 (5th Cir.1999).

IV. *Discussion*

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of "race, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). It expressly prohibits retaliation to hire or discharging an employee based on a prohibited factor. *Id.* Likewise, Title VII also expressly provides that "[i]t shall be an unlawful employment practice for an employer ... otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Id.*

**536**    MENDOZA v. BORDEN, INC.

Title VII does not mention sexual harassment. Nevertheless, the Supreme Court and this Court long have recognized that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment," which includes requiring people to work in a "discriminatorily hostile or abusive environ- ment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)) (other internal quotation marks and citations omitted); *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir.1982) (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971) ("'[T]he phrase 'terms, conditions, or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the prac- tice of creating a working environment heavi- ly charged with ethnic or racial discrimina- tion.'")).

[7] To establish a hostile-environment sexual-harassment claim under Title VII based on harassment by a supervisor, an employee must show: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sex- ual harassment, such as sexual advances, re- quests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was suffi- ciently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily hostile or abusive environ- ment; and (6) a basis for holding the employ- er liable. *Henson*, 682 F.2d at 903–05.[4]

[8] Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal "civility code.'" *Oncale v. Sundowner Offshore Ser- vices, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1000– 02, 140 L.Ed.2d 201 (1998) ("We have never held that workplace harassment, even harassment between men and women, is au- tomatically discrimination because of sex merely because the words used have sexual content or connotations."); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) ("A recurring point in these opinions is that 'simple tease- ing,' offhand comments, and isolated inci- dents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399 ("[N]ot all workplace conduct that may be described as 'harass- ment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

[9] Sexual harassment constitutes sex discrimination only when the harassment al- ters the terms or conditions of employment. The paradigm of sexual harassment as feder- ally prohibited employment discrimination occurs when an employee's expressed terms of employment, such as salary or continued employment, are conditioned upon compli- ance with the employee's sexual demands. *Burlington Indus.*, 118 S.Ct. at 2265 ("When a plaintiff proves that a tangible employment

---

4. Regarding this fifth factor, the Supreme Court held recently that in claims based on a supervi- sor's harassment, an employer may be vicari- ously liable for actionable hostile environment discrimination caused by a supervisor with im- mediate (or successively higher) authority over the employee—subject to an affirmative defense ... *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).

---

MENDOZA v. BORDEN, INC.    **537**

action resulted from a refusal to submit to a supervisor's sexual demands, he or she estab- lishes that the employment decision itself constitutes a change in the terms and condi- tions of employment that is actionable under Title VII."). In such a case, traditionally described as quid pro quo harassment, the "discrimination with respect to terms or con- ditions of employment [is] explicit." *Id.* at 2264; see also *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1246 (11th Cir. 1998).

[10] Absent such "explicit" discrimina- tion, an employee must make some showing in order to connect allegations of sexual harassment to a violation of Title VII. Thus, in the cases traditionally described as hostile- environment cases, an employee's harassing conduct unreasonably interferes with the em- ployee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir.1997) (cit- ing *Harris*, 510 U.S. at 23, 114 S.Ct. 367). The courts should examine the conduct in context, not as isolated acts, and determine whether the harassing conduct is sufficiently severe or pervasive "to alter the conditions of [the vic- tim's] employment and create an abusive working environment." *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399 (quoting *Henson*, 682 F.2d at 904).

[11, 12] Establishing that harassing con- duct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an ob- jective component. *Harris*, 510 U.S. at 21– 22, 114 S.Ct. 367. The employee must "sub- jectively perceive" the harassment as suffi- ciently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. *Id.* The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim ... subjectively perceive[s] ... to be abusive." *Id.* at 21, 114 S.Ct. 367. Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 118 S.Ct. at 1003, 140 L.Ed.2d 201 (1998) (quot- ing *Harris*, 510 U.S. at 23, 114 S.Ct. 367).

[13] The objective component of this analysis is somewhat fact intensive. Never- theless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is phys- ically threatening or humiliating, or a mere offensive utterance; and (4) whether the con- duct unreasonably interferes with the em- ployee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir.1997) (cit- ing *Harris*, 510 U.S. at 23, 114 S.Ct. 367, and explaining that "[w]e directed courts to determine whether an environment is suffi- ciently hostile or abusive by 'looking at all the circumstances'").

Other circuits have applied these factors to delineate a minimum level of severity or per- vasiveness necessary for harassing conduct to constitute discrimination in violation of Title VII. Many decisions throughout the circuits have rejected sexual-harassment claims based on conduct that is as serious or

**538**          MENDOZA v. BORDEN, INC.

more serious than the conduct at issue in this appeal. *Shepherd v. Comptroller of Public Accounts of Texas*, 168 F.3d 871, 872–75 (5th Cir.1999) (holding that several incidents over a two-year period, including comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264–67 (5th Cir.1999) (noting it was "dubious" whether several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual advance would be sufficient to establish a hostile environment); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998) (holding that statement that the was holding in her hand" were insufficient to alter the terms or conditions of the plaintiff's employment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir.1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn American, Inc.*, 129 F.3d 1355, 1365–66 (10th Cir. 1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can?"); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167–68 (7th Cir.1996) (holding

offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under *Harris* because not necessarily gender-related); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753–54 (4th Cir.1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823–24 (6th Cir.1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating; there's "Nothing I like more in the morning than sticky buns", suggesting land area he named as "Titsville" or "Twin Peaks", asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the bread to sign it"; telling plaintiff she was "paid great money for a woman"; laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's "constant" following and staring at Mendoza in a "very obvious fashion".

**MENDOZA v. BORDEN, INC.**          **539**

repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work—were not sufficient for actionable sexual harassment); *see also DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 588 (5th Cir.1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir.1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

[14]   In this appeal, the conduct alleged by Mendoza falls well short of the level of either severe or pervasive conduct sufficient to alter Mendoza's terms or conditions of employment. Construing the evidence in the light most favorable to Mendoza, she presented evidence of four categories of harassing conduct: (1) one instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's "constant" following and staring at Mendoza in a "very obvious fashion."

As an initial matter, whether Page's conduct testified to by Mendoza includes the necessary sexual or other gender-related

connotations to be actionable sex discrimination is questionable. *See Brill v. Lante Corp.*, 119 F.3d 1266, 1274 (7th Cir.1997) (rejecting the plaintiff's attempt to buttress a hostile-environment claim with evidence of unpleasant, but non-sexual, conduct); *Galloway*, 78 F.3d at 1167–68 (noting that the term "sick bitch" is not necessarily a sexual or gender-related term). For example, although the statement "I'm getting fired up" could under some circumstances denote sexual or romantic desire, Page's statement that he was "getting fired up" occurred in the context of reacting to a complaint by Mendoza. As he described the interaction: "I went into his office the angry and disgusted. . . . Mr. Page turned around and I said to him, 'I mean you 'yeah, I'm getting fired up, too.'" By Mendoza's own description, Page did not approach her but instead, she approached Page while another employee was present in his office. Mendoza also admits that Page said nothing else. Thus, the circumstances of this interaction do not objectively indicate that the statement "I'm getting fired up" had a sexual or other gender-related connotation.

[15, 16]   As another example, although "following and staring" can betray romantic or sexual attraction, the everyday observation of fellow employees in the workplace is also a natural and unavoidable occurrence when people work together in close quarters or when a supervisor keeps an eye on employees. For example, Mendoza described Page's constant "following and staring" as her always seemed to be wherever I was. If I was in the lunch room, he was there. If I was at a picnic table outside on a break, he was there." Nevertheless, because we conclude that the conduct established by Mendoza was not sufficiently severe or pervasive to alter Mendoza's terms or conditions of em-

540  MENDOZA v. BORDEN, INC.

ployment, we assume, but do not decide, that this conduct is sexual in nature and thus might implicate sex discrimination.[5]

Turning to the heart of this appeal, an examination of the factors from *Harris* and applied in *Allen* demonstrates that Mendoza did not endure conduct that was so severe or pervasive that it altered the terms or conditions of her employment. Three of the four factors—physically threatening or humiliating conduct, interference with job performance, and severity—are clearly absent from the conduct established by Mendoza. The other factor—frequency of the harassing conduct—is also for the most part lacking, but to the extent Mendoza showed frequent conduct, the frequency of it does not compensate for the absence of the other factors.

First and most importantly, Mendoza did not present evidence that Page's conduct was "physically threatening or humiliating" or that the cumulative effect of this conduct "unreasonably interfered" with Mendoza's job performance. Even construing the evidence in the light most favorable to Mendoza, Page's statement "I'm getting fired up" and the sniffing sounds are hardly threatening or humiliating. *Compare Hall v. Gus Const. Co.*, 842 F.2d 1010, 1012 (8th Cir.1988) (sexual harassment established with evidence that, *inter alia*, female employees were held down so that other employees could touch their breasts and legs), *with Long v. Eastfield College*, 88 F.3d 300, 309 (5th Cir.1996) (holding sexually-oriented joke is the kind of nonthreatening "utterance" that cannot alone

5. To establish that the harm alleged was "based on her sex," Mendoza "must show that but for the fact of her sex, she would not have been the object of harassment." *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982). The purpose of this Title VII is to strike at the disparate treatment of men and women. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Mendoza never

MENDOZA v. BORDEN, INC.

support hostile-environment claim). Even more clearly, the one instance of Page brushing his hip against Mendoza's hip and Page's constant "follow[ing]" of Mendoza are neither threatening nor humiliating. Likewise, nothing in the record indicates that Page's conduct impaired Mendoza's job performance.

Second, none of the conduct alleged by Mendoza is severe. Even if somehow offensive, Page's statement "I'm getting fired up," the three sniffing sounds, the one instance of physical contact, and the following/staring are much less severe than the incidents of sexual banter and inappropriate touching described, and found insufficient, by the Second Circuit in *Quinn* and the Fourth Circuit in *Hopkins*, for example. *Quinn*, 159 F.3d at 768 (holding a comment about the plaintiff's "posterior" and touching of her breasts are some papers did not create a hostile environment); *Hopkins*, 77 F.3d at 753-54 (holding that multiple instances of inappropriate conduct, including placing a magnifying glass over the plaintiff's crotch, did not establish sexual harassment).

Third, aside from Page's "constant" following and staring, the conduct asserted by Mendoza was not frequent. She established a single instance of slight physical contact, one arguably inappropriate statement, and three instances of Page's making a sniffing sound. These instances occurred over an eleven-month period and altered the conditions under which Mendoza was required to perform her

[17] To the extent Mendoza's testimony about "constant" following and staring establishes this evidence does not create a jury issue on Mendoza's sexual-harassment claim. There is no allegation of any staring or following Mendoza outside the workplace or of any calling Mendoza, after work. Regarding the workplace, Mendoza admits that Page never followed her in the office part of the plant where Mendoza worked, and thus necessarily spent most of her time.[7] Indeed, Mendoza did not describe the following as staring close behind her in an intimidating or threatening fashion, but instead simply as Page's showing up when Mendoza happened to be in the fax, the restroom, in the lunch room, or at the picnic hallways, in the lunch room, or at the picnic table outside. In her testimony at trial,

6. Mendoza says she never went into the processing plant which constituted the majority of the Miami facility.

7. The initial panel opinion does not either. *Mendoza v. Borden, Inc.*, 158 F.3d 1171 (11th Cir. 1998), *vacated*, 169 F.3d 1178 (11th Cir. 1999). The first and only time "walking" in connection with Mendoza's Title VII claim appears in this case are the dissents filed at the en banc stage.

8. Judge Tjoflat's dissent cites seven decisions involving following and/or staring. However, each case involves additional conduct that is not as egregious than what Mendoza alleges, and those cases in the dissent, if anything, highlight the insufficiency of Mendoza's evidence. For example, the dissent notes that *Cross v. Alabama Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1495-97 (11th Cir.1995), involved "glaring looks, piercing looks." However, that case also had seven female plaintiffs testifying that the harasser treated his women employees differently than men. According to one of the plaintiffs, the harasser threw objects at the women daily, yelled, screamed and belittled them, and engaged in name calling, derogatory remarks, verbal abuse, finger pointing, and offensive touching with women, but never engaged in this conduct

541

job. *Cf. Sprague*, 129 F.3d at 1366 (reasoning that the sexually-oriented incidents over sixteen months were sporadic).

Mendoza never described Page's following or staring as "stalking" or "leering" or "intimidating" or "threatening." Similarly, none of Mendoza's words regarding her Title VII claim before the panel or en banc characterizes Page's following or staring as "stalking," "leering," "intimidating," or "threatening."[7]

Given normal office interaction among employees, the following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable, even with evidence that the following and staring were "constant" and thus "frequent" under the *Harris* factors. Also, considering the following and staring described by Mendoza with and in the context of the one verbal statement, and one slight touching as Page walked by the fax, we find Mendoza's claim still falls short of actionable hostile environment sexual harassment.[8]

with his male employees. The harasser's manner of communicating with female employees was described as "extremely hostile, very angry, very aggressive" and "demeaning," but as "very professional" with male employees. The harasser's derogatory comments to women included "women can't do anything right," "women aren't worth anything," "in the ... but...," "a butt head," "a cow," "stupid," and "just a woman." The harasser told "sexual and dirty jokes," and made comments that mistakes would not happen if males were in the position of decision making. The women who testified that the described harasser who testified that he intelligent than men and said they "cause a lot of trouble, and the facility would be better off with men than women.

The other staring and following cases cited in Judge Tjoflat's dissent also involve egregious conduct that is missing here. *Wernwag Corp. v. United Papermakers Inorm.*, 171 F.3d 971, 972-73 (4th Cir.1999) (going into plaintiff's office and staring but accompanied by a pattern of leaving messages with a pig nose panting, and "love you, baby"; addressing her as "toy mama" and "foxy lady" for a year; asking for a

kiss and, when she refused, saying "I am serious, I want some tongue"); *Scoll v. Runyon*, 165 F.3d 1238, 1239 (9th Cir.1999) ("stalking" is alleged but the court also described the "gruesome facts" as "[n]umerous male coworkers and supervisors asked [plaintiff] to perform oral sex on her or both"); *Hathaway v. Runyon*, 132 F.3d at 1214, 1217 (8th Cir.1997) (the harasser stared at her with a menacing look, but also was "getting physically close and making peculiar comments, telling [plaintiff] that other workers believed they were romantically involved," making "physical sexual advances," such as "he hit her on the buttocks with a clipboard ... and a week later squeezed her buttocks"; plaintiff regularly "rubbed her body"); *Kopp v. Samaritan Health Sys., Inc.*, 107 F.3d 568, 570-74 (8th Cir.1997) (involving Brewer's "following her around the store" but also involving testimony that harasser "began to snicker and laugh at her, making guttural noises when she walked by him"); *Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 780-81 (10th Cir.1995) (alleging harasser was "making verbal and written sexually offensive remarks propositioning [plaintiff] and attempting to touch her breast"; after plaintiff reported the harasser, he "grabbed [plaintiff] between her legs"; also made "persistent requests for sexual favors but also made invitations to all female employees to satisfy his sexual desires," "passed a sexually explicit note to another female employee," "attempted to kiss [another female employee] on the neck and brushed her breast with his hand"); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1461-63 (9th Cir.1994) (alleging stares, glares, snickers, and comments," but along with "habitually referring[] to plaintiff and to other female employees in derogatory terms using sexually explicit derisive terms," such as calling plaintiff "dumb fucking broad," cunt, and "fucking cunt"; also calling "[plaintiff] to have sexual relations with him, sometimes threatening to demote or dock her if she did not do so; in the presence of others, commented on her body, told her vulgar jokes on a daily basis, showed her pornographic photographs, asked her to come to his house for training after work hours," "bragged about the size of his penis, and frequently brushed up against her legs and breasts, and after plaintiff complained, the har-

asser "then began requiring that [plaintiff] ask his permission ... to go to the restroom" so "[w]henever she asked to go to the restroom, [the harasser] would follow her and wait in the hall until she returned"). 

The dissent's cases vividly demonstrate why Mendoza's hostile environment claim is not actionable and why holding that her claim is actionable would deviate significantly from the law of other circuits.

9.  In *Baskerville*, the Seventh Circuit made an alternative holding that in any event the plaintiff loses because the defendant company took at reasonable steps to correct plaintiff from hall and was not vicariously liable. *Baskerville v. Culligan International Co.*, 50 F.3d 428, 431-32 (7th Cir.1995). However, the initial and primary holding was that Hall's conduct did not add up to actionable sexual harassment. *Id.* at 428-31.

The Court in *Gleason* also affirmed this Circuit's holding in *Gleason* by this another panel of this circuit. *Id.* at 1135. The Court in *Baskerville* (that This VII) stated, "We held in *Baskerville* (that This VII) established in this circuit as of this date that there is a 'safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or too equivocal to make a reasonable person believe that she has been discriminated against on the basis of sex." *Id.*

Were we to conclude that the conduct established by Mendoza was sufficiently severe or pervasive to alter her terms or conditions of employment, we would establish a baseline of actionable conduct that is far below that established by other circuits. For example, in *Baskerville v. Culligan International Co.*, the Seventh Circuit considered a sexual harassment claim consisting of nine instances of sexually offensive behavior by the alleged harasser over a period of seven months. 50 F.3d 428, 430 (7th Cir.1995). These instances included diminutive references to the plaintiff as a "pretty girl" and a "tilly" and one particularly obscene instance in which the alleged harasser simulated the act of masturbation. *Id.* The Seventh Circuit acknowledged the obvious offensiveness and therefore concluded that the plaintiff could not establish a hostile-environment claim. *Id.* The Seventh Circuit expressly held that the conduct that no reasonable jury could find that Hall's remarks created a hostile working environment." *Id.* at 431? Likewise, in *Shepherd*, the plaintiff produced evidence of several fairly serious instances of harassment including: (1) the statement, "your elbows are the same color as your nipples," (2) the statement, "you have big thighs," (3) attempts to look down the plaintiff's clothing; and (4) multiple instances of touching. 168 F.3d at 872. Similar to *Baskerville*, the Fifth Circuit found the Seventh Circuit's reasoning in *Baskerville*, concluded that the conduct was "boorish and offensive." *Id.* at 874. The Court, however, specifically found that the conduct was not severe, threatening, or an impediment to job performance and therefore concluded that the plaintiff could not establish a hostile-environment claim. *Id.* at 874-75. Although we need not endorse or adopt the conclusions in *Baskerville,*

expressly held that "we conclude that no rea-
sonable jury could find that Hall's remarks
created a hostile working environment." *Id.*

continued, "Our specific holding in *Baskerville* was that plaintiff's supervisor had not engaged in actionable sexual harassment even though over a seven-month period, he was guilty of the following: (1) called the plaintiff a 'pretty girl,' (2) made grunting sounds when the plaintiff wore a leather skirt, (3) said that his office was hot because the plaintiff was in it, (4) stated that a public address announcement asking for everyone's attention meant that 'all pretty girls [should] run around naked,' and (5) alluded to his wife's absence from town and his loneliness, stating that he had only his pillow for company while making an obscene gesture." *Id.* at 1144.

The court in *Gleason* reiterated that the "central teaching of the *Baskerville* opinion [is that] 'relatively isolated' instances of non-severe misconduct will not support a hostile-low-level harassment" is not actionable—[this holding] was recently reaffirmed by another panel of this circuit in *Galloway v. General Motors*, 78 F.3d 1164, 1168 (7th Cir.1996). This established in this circuit as of this date that there is a 'safe harbor for employers in cases in which the alleged harassing conduct is too tepid or intermittent or too equivocal to make a reasonable person believe that she has been discriminated against on the basis of sex." *Id.*

544

MENDOZA v. BORDEN, INC.

10. Sexual harassment in the workplace is a serious matter. However, beyond taking us out of step with our sister circuits, holding that the conduct here constitutes sexual harassment actionable under Title VII would trivialize true instances of sexual harassment. *See, e.g., Dees v. Johnson Controls World Services, Inc.*, 168 F.3d 417, 422 n. 12 (11th Cir.1999) (noting that "almost daily abuse including sexual jokes, references to the plaintiff's body and physical harassment established sexual harassment); *Splunge v. Shoney's, Inc.*, 97 F.3d 488, 490 (11th Cir.1996) (reasoning that the harassers "grabbed Plaintiffs, commented extensively on their physical attributes, showed them pornographic photos and videotapes, offered them money for sex, favored the harassers who submitted to their wishes with respect to the plaintiff's sexual prowess, and so on" was sufficient to establish a hostile environment).

Both dissents cite decisions from other circuits which they contend found conduct as serious or less serious than Page's sufficiently severe or pervasive to be actionable sexual harassment. However, when all alleged conduct in those decisions is actually listed, these decisions, if anything, highlight the insufficiency of Mendoza's evidence. *Williams v. General Motors*, 187 F.3d 553, 558-59 (6th Cir.1999) (these comments on different occasions: supervisor looked at plaintiff's breasts and said "You can rub up against me anytime"; supervisor said "You would kill me, [plaintiff's name]," (don't know if I can handle it, but I'd die with a smile on my face"; as plaintiff bent over, "Back up; just back up; or "You can back right up to me"; while placing his arm around her neck and his face against hers, said "You left the dick out of the [he'd spelled earlier] licked. Hey, dumb [expletive], I'll be sick and tired of these fucking women"; and plaintiff encountered "pranks," including finding office supplies glued to her desk, being hit by a thrown box, and being locked in her work area). *Rorie v. UPS, Inc.*, 151 F.3d 757, 761-62 (8th Cir.1998) (facts considered on motion for summary judgment; plaintiff described as manager that McFadden "often would tell [plaintiff] that she smelled good, pat her on the back, and brush up against her," and "[t]his behavior continued throughout her employment with UPS"; he "was constantly 'coming on' to her and would say that 'this was

[hat the way he [was] with women"; "[a] coworker, McFadden's employee, testified that "[a]ccepting McFadden's advances" and if she "had heard rumors about a co-worker's penis" and stating she "looked better in the UPS uniform than other women"—falls outside of 180-day period, but we believe that, at the very least, McFadden's comments suggest that his later behavior presents a jury question as to hostile environment"); *Howard v. Burns Bros., Inc.*, 149 F.3d 835, 838-41 (8th Cir.1999) (alleged comments such as plaintiff "had nice legs and that he was "going to get [her]"; he would "often brush against [plaintiff] intentionally while the two of them were working in the narrow area behind the fuel counter"; once he "brushed her buttocks and he kicked him"; he "said and did inappropriate things to other female employees"; another employee complained that he would "touch [her], put his arm around [her] or "talk nasty"; calling another employee a "fucking bitch"; other co-employees complained of two jokes "in which the punch line involved lewd gestures, in one instance, touching a woman's breast, and in the other, thrusting his hips into and women from behind"); *Gallagher v. Delaney*, 139 F.3d 338, 343-44 (2d Cir.1998) (supervisor "always seemed to be staring at [plaintiff], looking her up and down"; he kissed him three days later he gave her a posted plant; the next day, told her "the only place for her to sit was on his lap"; "invited her to lunch on numerous occasions"; then gave her more gifts, including jewelry, teddy bear, pink rose, angel book, sent her cards with handwritten notes that said "Believe me, [sic] the plaintiff], her on her physical appearance; plaintiffed her personal questions; "told her she brought out feelings in him that he had not had since he was sixteen"; invited her to Atlantic City and asked for her dance card free; gave her a Valentine's card with printed messages that said 'You're someone close in today of all days. You're someone close in thought and heart. Now and then, but always in special ways"); *Barna v. City of Cleveland*, Nos. 96-3971, 96-4178, 97-4138 (6th Cir.1998) (sexual harassment occurred on a daily basis and involved a continuous stream of sexual propositions, comments, advances, characterizations and ges-

MENDOZA v. BORDEN, INC.

545

employees—particularly men—at her workplace were treated considerably differently and better than she was treated. This failure of proof (apart from other reasons) warranted the district court's grant of a judgment as a matter of law for defendant.

V.  Conclusion

For the foregoing reasons, we conclude that the district court did not err in granting Borden judgment as a matter of law on Mendoza's sexual-harassment claim under Title VII. We agree with the panel's decision in this case that the district court properly granted summary judgment and judgment as a matter of law on Mendoza's state claims. Therefore, we affirm the district court's entry of judgment in favor of Borden on Mendoza's claims for age discrimination, disability discrimination, retaliation, and Mendoza's state-law claims. The judgment of the district court is

AFFIRMED.

EDMONDSON, Circuit Judge, concurring:

I concur in today's judgment and court opinion.

I write separately on a point, which the court's opinion does not reach, that I think deserves some attention: the essence of a Title VII case, including one based on a claim of sexual harassment, is plaintiff's proof of actual discrimination. And in this case, plaintiff never presented evidence that other

tures, including asking plaintiff for oral sex, at one point harasser "grabbed her" and "squeezed" one of her breasts and three male co-employees, two of whom saw the conduct and testifying "We're friends, aren't we honey?" while whispering "We're friends, aren't we honey?" about his sexual prowess to plaintiff); *Carrero v. New York City Housing Authority*, 890 F.2d 569, 578 (2d Cir.1989) (harasser "constantly touching [plaintiff] and attempting to bestow unasked for and unacceptable kisses upon her"); *Smith v. Norwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1412-15 (10th Cir.1997) (six closely related and severe disparaging remarks, such as plaintiff "would be the worst piece of ass that I ever had"; told plaintiff to "get a little this weekend" so she would "come back in a better mood"; she "would find a decent man if [she] put [her] ass" who "can't keep a man"; plaintiff was the

employees from all unpleasant and rude conduct in the workplace.[2] It is an anti-discrim-

Title VII was never intended to protect
employees from all unpleasant and rude con-

only full time female employee in small office with supervisor harasser and three male co-employees, two of whom saw the conduct and testified that the supervisor's conduct towards her was "sexually inappropriate", "offensive", and "intimidating").

Nothing in the record suggests that other employees, including men, were treated differently. When plaintiff was asked if other employees were treated the same as she was treated, she testified that she did not know.[1]

1. This question and answer is all that we have to go on about how other people were treated:

Q.  Well, you say [your supervisor] smiled at you. But, in fact, he smiled at other employees, also, didn't he?

A.  I don't know what he did with other employees.

2. *See, e.g. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) ("Title VII [is not] a general civility code[.]"); *Meritor Sav. Bank, FSB v. Vin-*

*Shepardize* the other cases cited herein, conduct shown by Mendoza has been found these decisions illustrate that conduct that is insufficient as a matter of law to sustain much more severe and pervasive than the hostile-environment claims.

*Italics*

Mendoza Italics

546                    MENDOZA v. BORDEN, INC.

ination statute. Title VII provides, in pertinent part:

(1) to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate* against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;

It shall be an unlawful employment practice for an employer—

to inject some heated protest towards the supervisor. Even the looking-and-sniffing incidents are not unambiguously sexual gestures. To sniff at something or someone is commonly understood to be a sign of contempt or disdain; a man or a woman could be the subject of that disdain and of that treatment.

42 U.S.C. § 2000e-2(a) (emphasis added). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (citations and internal quotations omitted). But in this case, plaintiff made no effort to show that she was treated differently and less favorably than male employees.

The conduct of which plaintiff complains is neither obviously sexual in nature nor even sex-specific. That supervisors regularly look at employees or place themselves in the same common areas of the workplace as employees ordinarily, the plaintiff testifies to that circumstance herself or himself. But that the burden can usually be met easily by a properly motivated plaintiff does not mean that meeting the burden is a meaningless formality or that actual evidence is unrequired.[3]

_____
son, 477 U.S. 57, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) ("[N]ot all workplace conduct that may be described as 'harassment' [is actionable.]").

3. Sometimes harassment plaintiffs are complaining of conduct that is definitely sex-specific or very clearly sexual in nature, for example, an invitation by a supervisor to engage in sexual intercourse. In those distinctive cases, the discrimination might be inferred from the conduct (it is circumstantial evidence of discrimination—

words can readily be explained as either a statement of anger or exasperation which could have been aimed at any employee—man or woman—who interrupts a conference proof.

Here plaintiff put forward just two witnesses, including herself. Neither of the witnesses claimed to know whether other employees—especially men—were treated significantly differently and better than plaintiff. Discrimination based on plaintiff's sex must be proved in harassment cases. The proof of discrimination was insufficient. This failure of proof by itself warranted the district court's grant of a judgment as a matter of law for defendant.

My thought is this one: at least when the sexual content of a supervisor's conduct is not obvious, a plaintiff asserting a claim of sexual discrimination in employment must present some evidence that plaintiff's coworkers, those not of plaintiff's sex, were treated differently and better.[3] Otherwise, Title VII's *vital* element—discrimination—is read out of the statute. The plaintiff's burden to show that similarly situated employees were treated better is not a heavy one; ordinarily, the plaintiff testifies to that circumstance herself or himself. But that the burden can usually be met easily by a properly motivated plaintiff does not mean that meeting the burden is a meaningless formality or that actual evidence is unrequired.

_____
based on sex) without further evidence: in the example, it is too unlikely that the same invitation would have been made by the same supervisor to a person of a different sex than plaintiff. But this footnote's example illustrates an exceptional case. A claim of sexual harassment is a claim of disparate treatment. The rule is that the plaintiff must actually prove discrimination; nor, truly by evidence showing directly that similarly situated persons not of plaintiff's sex were treated differently and better.

                       MENDOZA v. BORDEN, INC.                    547

This evidence—evidence of the discrimination—is the heart of the case. And, therefore, courts must allow no fudging on the proof.

CARNES, Circuit Judge, concurring:

Concurring fully in the judgment of the Court and in Judge Hull's opinion for it, I write separately to discuss the reluctance courts should have about permitting plaintiffs who claim sexual harassment to rely upon their subjective interpretations of ambiguous conduct. An essential part of Mendoza's contention that she was sexually harassed is based upon her perception that Page, her supervisor, constantly followed her around and stared at her. That is her perception, and more specifically, what she testified at trial is her perception, of the frequency and the manner in which Page went to where she was in the work place and looked at her during the eleven months she was under his supervision.

Mendoza's perception that Page had followed her around and looked at her in an offensive way brings to mind a recent Seventh Circuit case in which the plaintiff perceived that her boss had regularly talked to her in a "sexy voice." *See Minor v. Ivy Tech State College*, 174 F.3d 855 (7th Cir.1999). The Seventh Circuit's treatment of the "sexy voice" contention in *Minor* is instructive.

The plaintiff in that case was employed by a public vocational college whose chancellor, a man named Cole, had an office in another town. She claimed that for eleven months Cole called her "almost every day, rarely discussing business." *Id.* at 856. The court described the plaintiff's perception of these daily phone calls as follows:

Cole talked, she thought, in a very friendly way, the way a boyfriend might talk; his voice was sexy; and though he never asked her for a date or proposed any sexual or otherwise erotic connection, she believed that his calls constituted overtures awaiting a response from her. She says that his words were at times "stalkerlike" and "had these overtones at certain times that were sexual," but she does not indicate what the words were that gave her these impressions.

*Id.* The plaintiff in *Minor* also said that Cole, her boss, once entered her office and told her he had been watching her through a window, which she thought was "lecherous of Cole," and it really scared her. *Id.* There was objectionable conduct, including Cole putting his arms around her, squeezing her, and kissing her while saying, "Now, is this sexual harassment?" *Id.* at 857.

The Seventh Circuit affirmed the grant of summary judgment for the defendant in *Minor*, holding that the "sexy voice" conduct was outside the period of limitations and should not be considered. But the Court went on to hold in the alternative that even if that conduct was considered, there was still insufficient evidence of sexual harassment to avoid summary judgment. The Seventh Circuit explained why this had to be so:

As for Cole's "sexy voice," we are concerned about the legal risk that would be placed on employers if a plaintiff in a sexual harassment case could get to a jury

MENDOZA v. BORDEN, INC.  548

on the basis of nebulous impressions concerning tone of voice, body language, other nonverbal, nontouching modes of signaling. It is one thing to tell a supervisor that she should not propose sex to a subordinate, display pornographic pictures to her, or touch her in a suggestive fashion; those are indeed things that an employer should tell its supervisors not to do. It is another thing to tell a supervisor to make sure that its supervisors never inflect their voice or posture in such a way that a woman might think they were "coming on" to her. That would be a counsel of perfection, and the aims of Title VII require no more modest.

Id. at 858.

Likewise, it is "another thing" for an employer to be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they were, "coming on" to her. That would be, in the Seventh Circuit's words, "a counsel of perfection, and the aims of Title VII are more modest." Id. The Seventh Circuit in Minor also recognized that, "[i]t is no part of Title VII to change a 'hands on' management style (provided 'hands on' is understood metaphorically) merely because it might strike a suspicious employee as having sexual overtones." Id. The same is true of an "eyes on" management style. There is an objective as well as a subjective component to a sexual harassment claim. See Harris v. Forklift Systems, 510 U.S. 17, 21–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Stated somewhat differently, Title VII requires a baseline of objectively offensive conduct, and that baseline cannot be met with objectively ambiguous conduct that a suspicious employee subjectively perceives to be improper.

There are good reasons that this is so. In addition to those discussed by the Seventh Circuit in Minor, there is also the problem of

1. The Minor Court correctly recognized that "stalking a female employee crosses the line," id. at 858, but also rejected any notion that the employee's perception of whether she had been stalked is controlling. The plaintiff in that case testified that she perceived the conduct of Cole, her supervisor to be "stalker-like." Id. at 856. Instead of accepting her characterization, the Court considered the objective conduct involved and reached its own conclusion, which is that there had been no stalking. Id. at 858.

In reaching that conclusion, the Minor Court noted: "Cole did not follow Minor about, or drive past her home, or call her late at night, or make this a 'stalker' case. As the previous query has assumed, Cole (so following Minor) engaged her in conversations about sex or love." Id. at 858. Although Mendoza did testify that Page followed her about the workplace, that is not enough to distinguish this case from Minor. Minor's remark about Cole (so following Minor about) had no conceivable connection to supervisory duties ("He did not supervise her, or have any authority about sex or love"). The court was not talking about any "eyes on" perception of on-the-job conduct by a supervisor whose duties included observing employees.

They did not do so in the instant case. The present case does not involve stalking. It is obvious from the undisputed fact, which the Court's opinion makes clear, that it never occurred to Mendoza and her attorney, to use the word "stalking" to describe Page's conduct. Their "stalking" theory surfaced in their panel briefs, or in their en banc briefs. So far as it never occurred to anyone at the pre-trial, trial, or panel appeal levels of this case to describe Page as a stalker. The remarkable revelation that this is a stalking case has come only to the authors of the dissenting opinions at this, the en banc stage. As it happens, their belated as it is too late and unique. What appears so obvious to them now apparently never occurred to either of them at the panel stage, because their carefully crafted panel opinion fails even to mention the word "talk" or any derivative of it.

MENDOZA v. BORDEN, INC.  549

perception prevarication. An employee who makes up or exaggerates a description of objective conduct runs a risk of being found out that is greater than the risk run by an employee who is attempting to make a case based upon her subjective impressions. There is more temptation to exaggerate, to "puff," to put subjective spin on the facts. A plaintiff describing her subjective impressions might have appeared neutral to her in a sexy way or spoke to her in a sexy voice, or did both things, how is a supervisor who is innocent of any lecherous intent or thoughts to establish his innocence? Supervisors must observe, look at, and speak to employees they supervise, they regularly go about the work place to see what employees are doing, and sometimes follow them around on the work site. And supervisors should be free to do so without being hauled into court every time an employee—who may well have other reasons to be unhappy with the supervision—perceives the supervisor's constant presence, or the way he looks at her, or the tone of his voice, or the way he stands, or the way he walks, to be offensive to her.

This case illustrates the dangers of permitting litigation by perception. At her deposition, Mendoza was questioned about her claim that Page had followed her around the workplace:

Q. The second thing you mentioned was that Dan Page followed you all over the place.

A. Yes, he did, several times. This happened several times, two, three times that I can remember. I would go to the routeman's room reference paperwork. And when I would come out, go to the left end of the hall and watching me and smiling with her. Several times I laughed in his face. He might have taken it to be a smile like I enjoyed it. It wasn't a smile. I laughed in his face.

For Mendoza, the problem with her perception about Page following her around only "several times, two, three that I can remember," as she had described it under oath at deposition, is that it was unlikely to get her to the jury, to give her a chance at recovery from the company that had terminated her because she failed to come to work for three consecutive days. Given the nature of perceptions, however, that was no problem for Mendoza. When she got to trial, she simply changed her perception. During her trial testimony, she no longer perceived that Page had followed her around only "several times, two/three times that I can remember," but instead perceived that he had followed her around "constantly."

The Court does well to rule out litigation by perception and require objectively offensive conduct that is itself severe or pervasive before a Title VII claim can go to a jury.

This case illustrates the dangers of permitting litigation by perception. At her deposition, Mendoza was questioned about her

TJOFLAT, Circuit Judge, concurring in part, and dissenting in part, in which BIRCH, BARKETT and MARCUS, Circuit Judges, join:

In its zeal to discourage the filing of frivolous lawsuits, the Court today hands down an

opinion that will certainly be used by other courts as a model of how not to reason in hostile environment sexual harassment cases brought under Title VII.[1] Ten years ago, in *Vance v. Southern Bell Telephone and Telegraph Company*, 863 F.2d 1503 (11th Cir. 1989), overruled on other grounds, *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), this court, set forth an analytical framework for deciding when, under the totality of the circumstances, the plaintiff's case of harassment is sufficient to withstand a defendant's motion for judgment as a matter of law.[2] In reversing the district court, we explained that the district court had erred in granting the motion because it had failed to consider all of the circumstances in context and had instead analyzed each alleged instance of harassment separately. Apparently, *Vance* has now either been forgotten or is being ignored, because the court today makes *exactly* the same mistake that the district court made in that case ten years ago. I, therefore, respectfully dissent from the majority's holding with respect to the plaintiff's sexual harassment claim brought under Title VII.[3]

**I.**

Title VII forbids an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1) (1994). Sexual harassment is a form of sex

---

[1]. *See* Theresa M. Beiner, *The Misuse of Summary Judgment in Hostile Environment Cases*, 34 *Wake Forest L.Rev.* 71, 119 (1999) (positing that courts often grant motions for summary judgment and for judgment as a matter of law improperly because, in part, "the courts have seen a marked increase in Title VII claims generally, and in harassment claims in particular").

[2]. The question in *Vance* was whether the plaintiff's case was sufficient to withstand a motion for judgment notwithstanding the verdict (now under Fed.R.Civ.P. 50(b)). *See* 863 F.2d at 1506-06. Rule 50(b) has now been amended to substitute the term "judgment as a matter of law" for the term "judgment n.o.v." and directed verdict; and "motion for directed verdict and motion for judgment notwithstanding the verdict." Fed.R.Civ.P. 50(b) advisory committee's note.

[3]. I concur with the judgment of the court in all other respects.

---

discrimination within the meaning of Title VII. *See, e.g., Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49 (1986). Two types of sexual harassment are prohibited by Title VII: quid pro quo harassment and hostile work environment harassment. *See Fleming v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. at 371). If there is one principle of law that stands out in this area, it is that courts must look to the totality of the circumstances to determine whether the harassment is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *See Harris*, 510 U.S. at 23, 114 S.Ct. at 371; *Vinson*, 477 U.S. at 69, 106 S.Ct. at 2406; *Henson*, 682 F.2d at 904. Among other things, courts should look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. at 371.

The inquiry is both fact intensive, and contextually specific. It "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale*, 118 S.Ct. at 1003. This means that behavior that might be experienced by an employee as perfectly innocent in one context can, when considered in light of other occurrences and behavior, take on a more incriminating flavor. No act can be considered in isolation. Depending upon the circumstances, an employer's comment to an employee that he or she "looks good today," could be construed as a friendly compliment, a harmless flirtation, or the kind of sexually offensive verbal assault that is "every bit the arbitrary barrier to sexual equal-

---

In determining whether a plaintiff has met the burden of alleging sufficient harassment, the Supreme Court has recently reaffirmed "that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 118 S.Ct. at 1003. The majority recites the following statement from *Oncale* to support its position in the instant case:

> [A] professional football player's working environment is not severely or pervasively abusive . . . if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary, (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

*Oncale*, 118 S.Ct. at 1003.

**II.**

We review the district court's grant of a Rule 50(a) motion for judgment as a matter of law *de novo*, considering all the evidence in the light most favorable to Mendoza, the non-moving party. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir.1997), cert. denied, *Combs v. Meadowcraft Co.*, — U.S. —, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). A directed verdict is only proper when "[t]he facts and inferences . . . 'so overwhelmingly favor the verdict' that no reasonable juror could reach a contrary decision." *Bivens Gardens Office Bldg., Inc. v. Barnett Banks, Inc.*, 140 F.3d 898, 905 (11th Cir.1998) (quoting *Hibiscus Assoc. v. Board of Trustees*, 50 F.3d 908, 920 (11th Cir.1995)). Thus, to affirm the judgment as a matter of law, we must be convinced that no reasonable juror could have concluded that the conduct complained of constituted actionable sexual harassment in violation of Title VII.

**III.**

Before Mendoza went to work in the accounting department of Borden's Miami facil-

## 552

### MENDOZA v. BORDEN, INC.

tity, she spent some time as a cocktail waitress in restaurants, bars, and hotel lounges. Her work environment was often pervaded by foul language and personal insult. Some customers, doubtless after a few libations, attempted to approach Mendoza sexually. On at least one occasion Mendoza was followed home from work, and she was propositioned for dates several times. Throughout it all, Mendoza never made a claim of sexual harassment. At trial she stated that "it was just part of the job."

In December 1993, Mendoza found work as a temporary employee at Borden. For six months she experienced no job related difficulties that could give rise to a Title VII lawsuit. In fact, Mendoza was so successful in her temporary position that she was eventually hired as a permanent employee and given a pay raise. All of that changed when Dan Page came to work at Borden in 1994. Page was hired as the plant's "Controller." From his glass enclosed office, Page kept a watchful eye on the employees in the accounting department, all of whom knew that their job security and employment possibilities rested in his hands.

they both worked. He followed her in the plant's hallways and outside to the facility's picnic area.

Unfortunately for Page, his physical pursuit did not have its intended effect of piquing Mendoza's interest, and so he decided to use other methods of beguilement. Perhaps hoping that Mendoza would see his true "animal magnetism," Page stared at Mendoza's groin on at least three occasions and made a loud, sniffing sound. For unexplained reasons, Mendoza failed to become enraptured. In fact, she became rather terrified. But Page remained undaunted. Because Mendoza was not succumbing to his Casanova-like charms, he decided to make physical contact. One day when Mendoza was at the fax machine, Page walked over and moved his hips into hers while grabbing her shoulders and smiling at her. As inexplicable as it may seem, this again failed to capture Mendoza's favorable attentions.

By now Mendoza had also had enough. She had been stalked, leered at, touched on her hips and shoulders, and her groin area had been made the object of a sniffing ritual so bizarre that only Page could understand its true import. Jenny Volapeti[4] testified that on at least twelve occasions Mendoza told her that she was "being harassed on the job," and that "it was an immediate supervisor." Volapeti described Ted Mendoza, a woman who had accepted as "just part of the job" being propositioned and followed home from work during her years as a cocktail waitress, as "extremely distraught" and "very upset." But what could Mendoza do? With instances of co-worker harassment or even in many situations where one's superior is doing the harassing, the employee has

4. Jenny Volapeti is the wife of Mendoza's dentist, and she also manages his office. Her testimony is based upon conversations she had with Mendoza during several of Mendoza's dental visits.

## 553

### MENDOZA v. BORDEN, INC.

access to channels of complaint—the head boss or somebody who is superior to the alleged harasser. In this situation, however, Page was the head boss. He was the highest ranking employee at the Miami plant. Mendoza nevertheless went to tell him that she had come there "to work, period." Page's only response was that he was "getting fired up, too."

IV.

These are the facts when we view the evidence in the light most favorable to Mendoza, as we are required to do in reviewing a judgment as a matter of law. Reading the majority opinion, however, one would think that we are required to view the facts in the light most favorable to the defendant. The *en banc* opinion reads like a defense attorney's classic attack on a plaintiff (or a prospective plaintiff) in a sexual harassment evidence case. Contrary to the Supreme Court's direction, what

the majority does is examine each instance of harassment in isolation and then declare that it alone could not support a finding of liability. Because of this, and here is the rub, all of the evidence added *together* is likewise insufficient to satisfy the *Harris* requirement of severity or pervasiveness.

The majority declares that "Page's statement 'I'm getting fired up' and the sniffing sounds are hardly threatening or humiliating."[5] *Ante* at 540. With that evidence conveniently disposed of, the court, then moves on to scoff at "the one instance of Page brushing his hip against Mendoza's." *Id.* Last, we are told that Page's constant following and staring at Mendoza in a sexually suggestive manner cannot save the claim, because "[g]iven normal office interaction among employees, following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable. . . ." *Id.* at 541.

5. It is a mystery to me how the court could find that the sniffing sounds, in particular, "are hardly humiliating." The majority brushes over this piece of evidence lightly, but one wonders what response, if not humiliation, mixed with indignation, would be appropriate for a situation in which a woman's supervisor at work makes sniffing sounds. Perhaps the court views such conduct as normal and acceptable workplace behavior. *See generally* Daniel Patrick Moynihan, "Defining Deviancy Down," 62 *Am. Scholar* 17 (1993). In any event, the only case used to support the majority's novel proposition is *Weiss v. Eastfield College*, 88 F.3d 300 (5th Cir.1996). In *Long*, the Fifth Circuit took the entirely unremarkable position that one "offensive joke-cum-markable position that one "offensive joke-cum- ... told in [the plaintiff's] presence" could not, alone, form the basis of a hostile work environment claim. The majority draws the conclusion that the sniffing sounds are a prophylactic—humiliating." How the court could compare one joke, the subject of which was a prophylactic (and not the plaintiff's genitalia), told, apparently, not to the plaintiff, herself, but only "in [the plaintiff's] presence ... to this case, where

Mendoza has alleged multiple instances of Page staring directly at her groin, targeting Mendoza, specifically) and sniffing at her like some beast marking its prey, is beyond her.

6. The casual assertion that "Mendoza did not present evidence that 'physically threatening or humiliating' or that the cumulative effect of this conduct 'unreasonably interfered with Mendoza's job performance'" is both wrong and beyond this assertion. To be correct, Mendoza would have had to have taken the stand at trial, and then remain completely silent when questioned by her attorney. Remarkably, however, Mendoza did testify when she took the stand, and she presented a wealth of testimonial evidence that Page stalked and leered at her, sniffed at her groin, touched her, and made inappropriate sexual remarks. The inference that a reasonable jury could draw from this evidence is that Mendoza felt threatened and humiliated, and that Page substantially interfered with Mendoza's job performance.

There are only two possible conclusions that I can draw from the court's conclusion that Mendoza 'did not present [any] evidence.' The first is that in order for a plaintiff to be deemed to

**554    MENDOZA v. BORDEN, INC.**

have presented "evidence that [the] conduct was physically threatening or humiliating" over the cumulative effect of [the] conduct "unreasonably interfered" with [the plaintiff's] job performance," the court is now requiring that the plaintiff use "magic words" in her trial testimony, because we will no longer permit either juries, or ourselves, to draw inferences from the testimony presented. If this is the correct interpretation of the majority's statement, then henceforth, we would be requiring plaintiffs in hostile environment cases to recite the *Harris* factors, verbatim, in their testimony in order for us to recognize that the harassment was "frequent[]," "severe[]," "physically threatening or humiliating," and an "unreasonable[] interfere[nce] with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. at 371. In order to be adequate, the transcript from Mendoza's trial would have looked something like this:

Q. . . . [W]hat did [Page] do to you?

A. There was an incident where I was standing at a copy machine direct right next to his office. I was making copies. I felt somebody watching me. I looked directly to my right. He was sitting at a chair in the conference room, which is approximately 20, 25 feet away from me, at a chair at the end of the table. And he looked at me up and down, and stopped in my groin area and made a [indicat-ing] sniffing motion. [And I noticed the frequency of this discriminatory conduct; its severity; that it was physically threatening and humiliating; and that it unreasonably interfered with my work performance."]

This also happened another time. It had to be—in March. I had the flu. I went into his office—he was sitting at his computer—to tell him that my doctor wanted me to take time off because of the flu. And he turned around to his right, looked directly at me, up and down, and stopped again in the groin area, made a [And again.] I noticed the frequency. [And again.] . . . was physically threatening and humiliating, and that it unreasonably interfered with my work performance."

Q. Okay. And—from the looking you up and down, what—did he do anything that would . . .

A. The man was constantly watching me up and down, whether it was face to face with me up and down, following me around and looking me up and down. [And] as I would get up from a lunch table or from the picnic table to walk away and to go back to the office. [And I noticed the frequency of this discriminatory conduct; its severity; that it was physically threatening and humiliating; and that it unreasonably interfered with my work performance."

The alternative inference that we might draw from the majority's statement is that it does not actually take the majority at its word, and that what the court means to say is that "Mendoza did not present [enough] evidence that Page's conduct was physically threatening or humiliating, or that the cumulative effect of this conduct 'unreasonably interfered' with Mendoza's job performance." This is, likely, the correct interpretation of the majority's conclusion. From on high, the majority has determined that female employees should feel no humiliation or anxiety when their bosses sniff in the direction of their groins, touch their hips, and follow them around the office, staring at them in a sexually suggestive manner. That the court never explains why this is the case. That the court feels the need to resort to legal assertion in lieu of providing some justification for its position only bolsters my conclusion that it is a jury (traditionally, the finder of fact) and not the court who should be making these determinations.

Every defense attorney knows that this is the traditional way to undermine a case built upon circumstantial evidence. You isolate each piece that the other side puts into evidence and then attempt to trivialize it by taking it out of context. The defendant was just driving his car, the defense attorney will argue. So what of the fact that the car was parked outside a bank? People park outside

**MENDOZA v. BORDEN, INC.    555**

of banks all the time. The bank was being robbed at the time? How could the defendant have known that? He was sitting outside the bank, remember. And so what of the fact that defendant allowed the two men who were robbing the bank into his car, and then drove away at a high rate of speed? People drive at a high rate of speed all the time. Can the members of the jury actually say that they have never broken the speed limit?

The majority's analysis might be useful for a practicing seminar on defense strategies in employment discrimination cases, but it is certainly not faithful to the Supreme Court's "constellation of surrounding circumstances" when analyzing the sufficiency of a plaintiff's allegations. *Oncale*, 118 S.Ct. at 1003. More than a decade ago in *Vance*, we addressed a district court that made the same analytical mistake that the majority makes today. In that case, the district court granted a directed verdict to the employer after examining independently each allegation of harassment, and finding either that the plaintiff had failed to make out a prima facie case for each incident, or that the defendant had provided a legitimate, nondiscriminatory reason for its conduct. After weeding out most of the plaintiff's allegations in this manner, the district court then ruled that the two remaining instances of harassment (a noose was twice hung over the plaintiff's work station) were insufficient to establish a "persistent, pervasive practice." *Vance*, 863 F.2d at 1510 (quoting *Vance v. Southern Bell Tel. & Tel. Co.*, 672 F.Supp. 1408, 1413 (M.D.Fla.1987)). We corrected the district court as follows:

> The prima facie showing in a hostile environment case is likely to consist of evidence of many or very few acts or statements by the defendant which, taken together, constitute harassment. It is important to recognize that in assessing the credibility and weight of the evidence presented, the jury does not necessarily examine each alleged incident of harassment in a vacuum. What may appear to be a legitimate justification for a single incident of alleged harassment may look pretextual when viewed in the context of several other related incidents.
>
> . . . .
>
> [T]he district court examined each individual allegation of discrimination in turn, and found that the plaintiff had made out a prima facie case of discrimination only as to the two noose incidents. . . . [But] as we stated in *Hixson*, the severity of the harassment is to be determined by the totality of the circumstances. It was thus incorrect for the district court to require that the plaintiff establish a prima facie case of discrimination as to each individual allegation that the jury could properly consider. A hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits.

*Id.* at 1510-11 (citations omitted).

The majority today makes the same mistake as the district court did in *Vance*. By examining each of Mendoza's allegations of harassment in isolation from one another, the majority concludes that Mendoza does not have enough evidence to reach the jury because each allegation is individually insufficient. But the whole of a hostile environment sexual harassment case will often be greater than the sum of its parts. Incidents that might not seem so disturbing by themselves can take on new meaning in the context of other evidence of discrimination. This case is a perfect example. By itself, it may not seem so significant that Page moved his hip into Mendoza's while touching her shoulder and smiling at her suggestively. But add to that a suggestive comment ("I'm getting fired up"). Now the hip incident begins to look a little more troubling. By the time we get to the repeated incidents of Page's staring directly at Mendoza's groin

and making sniffing sounds, we realize that Mendoza's whole employment experience at Borden's may have been pervaded by overt and highly offensive acts of sexual aggression. Once we take all the evidence into account, we begin to appreciate that Page's conduct following and staring at Mendoza may have been motivated less by a need to monitor employee work habits, than by a desire to stalk and terrorize an innocent female victim.[7] If we looked to the majority for guidance, however, we would miss all of this. We would miss the proverbial forest for the trees because we would fail to see the cumulative meaning of Mendoza's allegations in context.

The majority mistakes do not end here. As I read the majority opinion today, it appears that we are telling district courts that they should cast a skeptical eye towards a plaintiff's evidence of pervasive stalking and leering by a supervisor in hostile environment sexual harassment cases. The court writes that "[g]iven normal office interaction among employees, the following and staring in the manner described by Mendoza are not the type of conduct that can render Mendoza's claim actionable, even with evidence that the following and staring were 'constant' and thus 'frequent'" under the Harris factors." Ante at 541. The first problem with this reasoning is that it is circular. The court answers the question, why are the following and staring alleged by Mendoza not the kind of conduct that can support a sexual harassment claim, with a most insightful response: because they "are not the [right] type of conduct." Id. This is plainly inadequate. The question deserves an answer, not a tautology.

But the real problem runs deeper. The logical inference that one draws from the court's statement is either: (a) that a plaintiff can never use evidence of following and staring by a supervisor to buttress a claim of sexual harassment, or (b) that in order for evidence of following and staring to be considered probative, it must be something more than "constant." The answer almost certainly cannot be (a). No court has ever made such a sweeping declaration, defining an entire class of conduct as immune to suspicion. In fact, courts routinely use evidence of following and/or staring to support a finding of sufficient severity or pervasiveness. See Cross v. Alabama Dept of Mental Health & Mental Retardation, 49 F.3d 1490, 1495 (11th Cir.1995) ("glaring looks, piercing looks"); Westococo Corp. v. United Paperworkers Int'l Union, AFL-CIO, 171 F.3d 971, 973 (4th Cir.1999) ("stare at her for periods of ten to twenty minutes"); Stohl v. Runyon, 165 F.3d 1288, 1239 (9th Cir.1999) ("stalked her throughout the postal facility"); Kimzey v.

---

7. The majority, and Judge Carnes in his concurrence, make much of the fact that Mendoza never actually uses the word "stalking" to describe what Page was doing to her. What Page testified at trial was that Page "followed" her "constantly." Webster's Third defines "follow" as "to go after in pursuit of in an effort to overtake," and it lists as synonyms the words "pursue," "chase," "tag," "trail," and "tail." Webster's Third New International Dictionary 883 (1993). "Constantly" is defined as "without variation, deviation, or change," or "with regular occurrence" (the listed synonyms are "ever," "always," and "incessantly"). Id. at 485. The

8. The majority appears to have gone to some trouble to distinguish these cases. See ante at 541–43, n. 8. The court's purported distinction lies in the difference between the severity or pervasiveness of the harassing conduct at issue in the cases I cite, and the severity or pervasiveness at issue in this case. But I do not cite these cases for the proposition that courts have found conduct equivalent to that alleged by Mendoza to be sufficiently severe or

Wal-Mart Stores, Inc., 107 F.3d 568, 571 (8th Cir.1997) ("following her around the store"); Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1478 (9th Cir.1997) ("stare at her during work"); Harris v. L & L Wings, Inc., 132 F.3d 978, 980 (4th Cir. 1997) ("followed her around the warehouse"); Hathaway v. Runyon, 132 F.3d 1214, 1217 (8th Cir.1997) ("stared at her with a menacing look"); Hirase-Doi v. U.S. West Communications, 61 F.3d 777, 780 (10th Cir. 1995) ("threatening and intimidating stares"); Steiner v. Showboat Operating Co., 25 F.3d 1459, 1462 (9th Cir.1994) ("Stares, glares, snickers, and comments"); cert. denied, ––– U.S. –––, 115 S.Ct. 733, 130 L.Ed.2d 636 (1994); Cortes v. Maxus Exploration Co., 977 F.2d 195, 198 (5th Cir.1992) ("Whenever she asked to go to the restroom, [the supervisor] would follow her and wait in the hall until she returned").[8] Given the Supreme Court's repeated emphasis on social context, that "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships," Oncale, 118 S.Ct. at 1003, it would make no sense for us to exclude, ex ante, a whole class of behavior from the realm of what might contribute to a finding of sexual harassment.

The court must, therefore, be saying that in order for evidence of following and staring to be considered probative, it must be something more than what Mendoza alleged. It is difficult to imagine what that "more" might consist of. The majority alleged that Page's following and staring were "constant," making his conduct appear to be the equivalent of stalking and leering. See supra at n. 7. But apart from the majority's failure to describe what kind of following and staring would be sufficiently harassing to "count" in an employee's claim for hostile environment sexual harassment (must the harasser walk closer to the victim? must the victim? must the court once again substitutes bald assertion for reasoned argument. Why is the following and staring "not the type of conduct that can render Mendoza's claim actionable"? We do not know. The court has cited no case to support this specific proposition, we must take it, on faith that

At the risk of appearing monotonous, let me repeat that behavior that might be experienced by an employee as perfectly innocent in one context can, when considered in light of other occurrences and behavior, take on a more incriminating flavor. And "[w]hat may appear to be a legitimate justification for a single incident of alleged harassment may appear innocent or trivial in isolation." Vance, 863 F.2d at 1510. Certainly an employee's bare allegation that her supervisor was "following" her around the office and that the supervisor often "stared" at her while she was trying to work would not be sufficient to support a claim for harassment. But when that super-

---

pervasive to support a hostile environment claim. I cite these cases to establish that proposition, infra. I cite them for the proposition, that "courts routinely use evidence of following and/or staring to support a finding of sufficient severity or pervasiveness." Nothing in the majority's lengthy commentary discussing these cases undermines that proposition.

interpreted as sufficiently offensive and harassing.

look, pretextual when viewed in the context of several other related incidents." Vance, 863

**558**    MENDOZA v. BORDEN, INC.

visor has been used for the proposition that the employee "following and staring" at the employee "constantly" for over four months, stared at the employee's groin and made sniffing noises, rubbed up against the employee's hips with his own while touching the employee's shoulder and smiling suggestively, and made sexually suggestive remarks to the employee, then the "following and staring" begin to look more like "stalking and leering."

When analyzed cumulatively and in context, Mendoza has certainly presented enough evidence to survive Borden's Rule 50(a) motion for judgment as a matter of law.

9. My reading of these cases convinces me that they do not stand for the proposition for which they are cited.

*Indest,* 164 F.3d at 267. In *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2nd Cir.1998), the plaintiff only alleged two instances of harassment (comment that plaintiff had the "sleekest ass" in the office and a contact with plaintiff's breast by some papers that the alleged harasser was holding in his hand), a far cry from Mendoza's claim of "constant" harassment. The same lack of pervasiveness is evident in *Adusumilli v. City of Chicago,* 164 F.3d 353, 361 (7th Cir. 1998), where the plaintiff alleged "no more than teasing about her squad cars, ambiguous comments about bananas, rubber bands, and low-neck tops, staring and attempts to make eye

MENDOZA v. BORDEN, INC.    **559**

contact, and four isolated incidents in which a co-worker briefly touched [plaintiff's] arm, fingers, or buttocks". The court in *Adusumilli* specifically affirmed the district court's exclusion of evidence that would have made the harassment appear more severe than it was. The district court saw a window into the plaintiff's affidavit that she "was harassed on a near daily basis by [her] co-workers," because the court found that it "was contradicted by the plaintiff's deposition testimony. *Id.* at 360. There is a similar lack of pervasiveness in *Sprague v. Thorn Americas, Inc.,* 129 F.3d 1355, 1366 (10th Cir. 1997) (four relatively innocuous comments and one attempt to look at plaintiff's dress over a sixteen month period). *Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164 (7th Cir.1996) is inapposite. That case did not hold that plaintiff's allegations were "insufficient under Title VII to constitute sexual harassment was not sufficiently severe or pervasive [the proposition for which the majority cites it]. Rather the court in *Galloway* went into a long discussion about why the harassing conduct (calling the plaintiff a "sick bitch") was not gender related at all because the crazy "whacko...and thus there could be no liability. Title VII's cause of action there was no evidence of differential treatment. *Galloway,* 78 F.3d at 1167-68. In this case, the court purports to assume that the conduct alleged by Mendoza "is sexual in nature and thus might implicate sex discrimination". *Ante* at 540.

The citation to *Black v. Zaring Homes, Inc.,* 104 F.3d 822 (6th Cir.1997), would be effective.

stant." This means that she was harassed and leered at *every day* for at least four months, was not subject to sexual harassment that in addition to being touched, verbally harassed, and sniffed at in a clearly sexual and disgusting manner. It may well be that at

See *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 647–48 (11th Cir.1997). None of the cases cited by the majority supports the proposition that "the circuits have rejected sexual-harassment claims based on conduct that is as serious or more serious than the conduct at issue in this appeal." *Ante* at 537–38. If one carefully examines the cases the majority cites, one finds in every single one of them either that the conduct at issue was much less pervasive than the conduct at issue in this case, or that the case is inapposite for other reasons." In this case, Mendoza alleges that the harassment she experienced was "con-

were it not for the court's reliance in that case on thought to cross the line that separates vulgarity (not actionable) from harassment (potentially actionable), the plaintiff must lose because the comments were not directed at plaintiff. *Id.* at 828. In the instant case, there is no dispute that Page's harassment was directed specifically toward Mendoza (indeed, Page's sniffing was apparently directed specifically toward Mendoza's genital region). *Kidwai v. McDonald's Corp.,* No. 93–1720 (4th Cir. August 18,1994) involved isolated incidents that were not nearly as severe or pervasive. In *Kidwai,* the court, opined that the plaintiff had a boyfriend, once asking plaintiff if she was in bed with someone, asking plaintiff on one occasion), with regard to *Kidwai,* it is clear that this is an unpublished opinion from the Fourth Circuit, given that citations to such cases are disfavored 4th Cir. R 36(c). The holding in *Weiss v. Coca-Cola Bottling Co. of Chicago,* 990 F.2d 333 (7th Cir.1993), is on shaky ground because in that case, the court relied heavily on *Scott v. Sears, Roebuck & Co.,* 798 F.2d 210 (7th Cir.1986). The Seventh Circuit has since recognized that its holding in *Scott*—that to be actionable, harassment must "cause such anxiety and debilitation to the plaintiff that working conditions [are] poisoned"—has been effectively overruled by the Supreme Court's decision in *Harris,* 510 U.S. at 21, 114 S.Ct. at 370–71. See *Saxton v. American Tel. and Tel. Co.,* 10 F.3d 526, 533–34 (7th Cir.1993).

The two major cases the majority uses to support its claim that "[w]here we have had occasion to consider whether [touching is] sufficiently severe or pervasive to alter her terms or conditions of employment, we would establish that the conduct established by Mendoza was not likely colored by the fact that the harassment was same-sex, male on male. The court," found that much of the alleged conduct "was directed at other co-worker, not at plaintiff." *Ante* at 541.) *Hopkins* v. *Baltimore Gas & Electric Co.,* 77 F.3d 745 (4th Cir.1996) (alleged harasser "bumped into plaintiff, positioned a magnifying glass over [plaintiff's] crotch, flipped his tie over to see its shaft, and stood too close to her while she received line at [a] wedding and stared at him while rubbing his thigh). Again, unlike this case, the alleged harasser in *Hopkins* was a supervisor; and thus the plaintiff likely experienced the conduct as less severe because she did not have to worry about complaining about a superior. *Hopkins* was a pre-*Oncale* decision that was likely colored by the fact that the harassment was same-sex, male on male. The court," found that much of the alleged conduct "was directed at other co-worker, not at plaintiff." *Ante* at 541.) *Hopkins,* 77 F.3d at 753. Again, the point in this case purports to assume that the conduct alleged by Mendoza "is sexual in nature." *Ante* at 540.

In sum, the majority lacks case support for its proposition that conduct like that alleged by Mendoza has been found insufficient "as a matter of law" to meet the *Harris* requirements of sufficient severity or pervasiveness. *Ante* at 545.

alleged harasser's] remarks could reasonably be disgusting manner. It may well be that at trial, a jury would conclude that Mendoza was not subject to sexual harassment that was sufficiently severe or pervasive to create a hostile work environment. Because the inquiry is so fact intensive and contextually

560    MENDOZA v. BORDEN, INC.

specific, however, Mendoza's allegations certainly meet the threshold of what is required for the case to reach a jury. See Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1561, n. 13 (11th Cir.1987) ("With access to all the evidence, and with the common sense to make credibility determinations, a factfinder should not find it difficult to distinguish between harassing actions that constitute a violation of Title VII and those 'ambiguous' actions which simply may not 'create an abusive working environment.'").

10. The majority's reading of Rorie seems slightly misleading. In note 10 of the court's opinion, the majority claims that "when all the alleged conduct in the decision) is accurately listed, [the decision] ... if anything, highlight[s] the insufficiency of the evidence." The majority, in my opinion, the plaintiff alleged that her manager patted her, and told her that she smelled good. In note 10 of the court's opinion, the majority attempts to "reveal" the actual facts at issue in Rorie. In it suggests that, in addition to the manager placed a "telephone call to plaintiff, the actual facts are relied heavily on findings that she 'had heard rumors about a co-worker's personal relationship with another woman.' And UPS uniform than other women." Rorie at 544 n. 10. The court in Rorie, however, did not rely on these "additional" allegations to support its conclusion that plaintiff's allegations of the manager placing her on the back, brushing up against her, and telling her that she smelled good were enough to present a jury question as to hostile environment. The court specifically found quite that the "additional" allegations that the majority cites today fell outside of the 180 day period within which the plaintiff filed her complaint with the EEOC, and thus could not be considered by the court in any way other than to "provide relevant background." Rorie, 151 F.3d at 761. The Rorie court wrote:

UPS argues that the only actions falling within the 180-day period are McFadden's comments about Rorie smelling good, patting her on the back, and brushing up against her. UPS contends that these actions are insufficient to support a hostile environment claim because McFadden was seldom in [the place

where Rorie worked] ... UPS also contends that Rorie failed to complain of McFadden's conduct. We disagree.

In September 1995, McFadden telephoned Rorie at home. During their conversation, McFadden asked Rorie if she would like to go swimming and whether she had heard rumors about the swimming invitation. During the same conversation, Rorie complained to McFadden about a female co-worker's attitude toward her. McFadden told her it was because Rorie looked better in the UPS uniform than the other woman.

While we concede that the facts of this case are on the borderline of those sufficient to support a claim of sexual harassment, we cannot say that, at the very least, McFadden's comments suggest that his later behavior presents a jury question as to hostile environment.

Rorie, 151 F.3d at 761-62 (emphasis added). The proposition for which I cite the case, therefore, remains undisputed. The Eighth Circuit has found that a plaintiff who alleged that her manager patted her on the back, brushed up against her, and told her that she smelled good had alleged conduct severe or pervasive enough to create a jury question as to hostile environment. Mendoza's allegations unquestionably go beyond the conduct at issue in Rorie. Therefore, other circuits have found conduct that is less egregious than that alleged by Mendoza sufficiently severe or pervasive to survive a motion for judgment as a matter of law.

Other circuits have found conduct that is less egregious than that alleged by Mendoza to be sufficiently severe or pervasive to survive a motion for judgment as a matter of law). Today's opinion appears to require a plaintiff to make a showing that is beyond that required by any other circuit. I say this because the only cases cited approvingly by the majority involved conduct so outrageous that it will shock the conscience of employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

Harris, 510 U.S. at 22, 114 S.Ct. at 370-71.

We do not transform Title VII into a workplace "civility code," Oncale, 118 S.Ct. at 1002, when we condemn conduct less severe than that which shocks our conscience. And when we raise the bar as high as the majority does today, it becomes more likely that we will miss the subtle forms of sex discrimination that may still infest the workplace, and make it more difficult for women, especially to participate on terms of equality with their male counterparts.[11] The sexist

MENDOZA v. BORDEN, INC.    561

Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, religion, or national origin offends Title VII's broad rule of workplace equality.

Harris, 510 U.S. at 22, 114 S.Ct. at 370-71.

We do not transform Title VII into a workplace "civility code," Oncale, 118 S.Ct. at 1002, when we condemn conduct less severe than that which shocks our conscience. And when we raise the bar as high as the majority does today, it becomes more likely that we will miss the subtle forms of sex discrimination that may still infest the workplace, and make it more difficult for women, especially to participate on terms of equality with their male counterparts.[11] The sexist

less egregious than that alleged by Mendoza to survive a motion for judgment as a matter of law). Today's opinion appears to require a plaintiff to make a showing that is beyond environment that required by any other circuit. I say this because the only cases cited approvingly by the majority involved conduct so outrageous that it will shock the conscience of employees job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.

look of the reasonable woman is adopted, the defendants as well as the courts are permitted to sustain ingrained notions of reasonable behavior fashioned by the offenders") (Keith, J., concurring in part and dissenting in part). This case is a perfect example. Mendoza is certainly not a woman of Victorian sensibilities who was unilaterally excluded in the "reasonable person" standard tends to be male-biased and tends to systematically ignore the experiences of women.

See Vinson, 477 U.S. at 60, 106 S.Ct. at 2402 (harassment included forcible rape on several occasions). As the Court made clear in Harris,

of six sexually disparaging remarks sufficient to survive a motion for judgment as a matter of law.

A woman who is often boorish ways of working-class employment. Before going to Borden she worked for years as a cocktail waitress, a job that one imagines could not be staffed with those who possess the most delicate of constitutions. If Mendoza found her harassment at Borden to never had to serve drinks to a gaggle of besotted, leering males, would feel similarly.

10. The court's conclusion in Rorie is fully consistent with our holding today that, at the very least, alleged instances of sexual harassment as a matter of law. Recognizing sexual harassment as a matter of law that, at the very least, a supervisor who pats a female employee on the back, brushes up against her, and tells her she smells good does not constitute sexual harassment as a matter of law. Recognizing that the conduct at issue in Rorie was not beyond the pale for sexual harassment, and that a woman must allege multiple rapes before she can make out a claim for sexual harassment.

11. We also become more vulnerable to the charge that in deciding whether the "reasonable person" would find alleged instances of workplace harassment to be sufficiently severe or pervasive to alter the conditions of employment, we are in fact adopting the perspective of a "reasonable man" and thereby excluding the sensible harasser, and systematically excluding the victims of sexual harassment. See Kathryn Abrams, "Gender Discrimination and the Transformation of Workplace Norms," 42 Vand. L.Rev. 1183, 1203 (1989); Ellison v. Brady, 924 F.2d 872, 879 (9th Cir.1991) ("a sex-blind reasonable person standard tends to be male-biased and tends to systematically ignore the experiences of women."); Rabidue v. Osceola Refining Co., 805 F.2d 611, 626 (6th Cir.1986) ("[U]nless the out-

remark, the offensive touch, the repeated request for an intimate outing; all of these may seem merely annoying and relatively harmless in isolation from one another. But add them up; see them in context, and then try to imagine what it must be like for an employee who merely wants to come to work and make a living to have to endure a daily barrage of sexual assault. Then we might begin to understand the power that these "little" sexual offenses, when considered collectively, can have in reproducing a workplace in which women, especially, are often still thought of by their male employers as incompetent toys and playthings.

Of course not all sexually offensive conduct in the workplace rises to the level of a Title VII violation. See *Harris*, 510 U.S. at 21, 114 S.Ct. at 370 (excluding from Title VII's coverage "conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment"). The conduct alleged in this case, however, goes far beyond "simple teasing," offhand comments, and isolated incidents." *Faragher*, 118 S.Ct. at 2283 (citations omitted). According to Red Mendoza, her direct supervisor made a daily game out of following and staring at her in a sexually offensive and humiliating manner. He touched her, made sexual comments to her, and sniffed in the direction of her groin in a way that goes beyond the boorish to the patently offensive. This is not just "uncivil"

It may be illegal. At the very least, Mendoza ought to be allowed to present her claim to a jury.

### V.

Today's decision represents a major departure from established sexual harassment law. Out of nowhere, the court has decided that evidence of stalking and leering by a harasser should be given short shrift when used to support a claim for hostile environment sexual harassment. Moreover, the court's whole method of analysis is unfaithful to a body of precedent directing us to review the plaintiff's allegations cumulatively.[12] I sympathize with what the majority is trying to do today—to "police the baseline for hostile environment claims," *Ante* at 535 (citation omitted), thus enabling district courts to weed out frivolous claims that burden the federal docket. This, however, is not the way to do it. It is Congress that enacted Title VII. When we ignore the congressional mandate, as interpreted by the Supreme Court, we become most vulnerable to the charge that we, as members of the unelected federal judiciary, are usurping the legislative prerogative. It may be the case, as Justice Scalia has observed, that "[a]s a practical matter, [the Court's holding in *Harris*] lets virtually unguided juries decide whether sexually related conduct engaged in (or permitted by) an employer is egregious enough to warrant an

---

12. The degree of departure from established precedent is made even more manifest when one observes that this case was not worthy of *en banc* review in the first place. Under Eleventh Circuit Rule 35-3, *en banc* consideration "is an extraordinary procedure intended to bring to the attention of the entire court a precedent-setting error of exceptional importance ... [or] a panel opinion that is allegedly in direct conflict with precedent of the Supreme Court or of this circuit." See also, Fed. R.App. P. 35(a). There was certainly nothing "extraordinary" or "precedent-setting" about the panel opinion in this case. It

award of damages." *Harris*, 510 U.S. at 24, 114 S.Ct. at 372 (Scalia, J., concurring). If this is a problem, however, the solution lies with Congress and not the Third Branch.

Accordingly, I would vacate the judgment dismissing Mendoza's Title VII sexual harassment claim, and remand that claim to the district court for a new trial.

BARKETT, Circuit Judge, concurring in part, and dissenting in part, in which BIRCH, Circuit Judge, joins:

I concur with the judgment of the court but for the affirmance of the directed verdict on the sexual harassment claim. To affirm the directed verdict in this case, the majority must conclude, after "review[ing] all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party," that no genuine issue of material fact exists and no "reasonable and fair-minded persons ... might reach different conclusions" as to whether Red Mendoza suffered sexual harassment. A directed verdict is only proper where "[t]he facts and inferences ... 'so overwhelmingly favor the verdict that no reasonable juror could reach a contrary decision.'" *Bienvenu v. Texaco, Inc.*, 164 F.3d 901, 906 (11th Cir.1999) (quoting *Hibiscus Assoc. v. Board of Trustees*, 50 F.3d 908, 920 (11th Cir.1995)).

The method by which the majority reaches its disputed conclusion that the alleged conduct fails to present a jury question is flawed in several respects. First, that conclusion depends on an account of the alleged conduct, that is inconsistent with the record. Second, that to achieve that account, the majority disregards the law requiring that all incidents be considered as a whole and disaggregates the conduct at issue. Taking each alleged incident separately, the majority credits only one of the conduct described, and deliberately excludes from consideration major components of Mendoza's harassment claim, inferring that being followed or stared at in the workplace can not under any circumstances contribute to a sexually harassing hostile environment. Thus, by selectively considering the facts and choosing the inferences to be drawn from them, the majority usurps the quintessential jury function.

Third, throughout this process the majority misapprehends and misstates the law of sexual harassment. Because reasonable people could differ as to the inferences to be drawn from the facts in evidence, and because the majority errs in explicating and applying the law, I dissent from the affirmance of the directed verdict on Mendoza's sexual harassment claim.

### I. THE TESTIMONY IN THIS CASE

The crux of this case is whether the conduct conveyed by Mendoza's testimony in its totality *could* be deemed by a reasonable jury to be objectively either (a) severe, *or* (b) pervasive enough to alter the conditions of her employment, sufficient to create an abusive work environment. There is no question that the issue here relates not to severity but to acts which, because of their alleged frequency and connection to other acts sexual in nature, could be deemed pervasive enough to constitute a hostile environment. The standard for whether such an environment exists is a res-

564    MENDOZA v. BORDEN, INC.

sonable person would find hostile or abusive. Instead of viewing the evidence tending to disprove the claim, the Supreme Court has told us that, "in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case." *Wilkerson v. McCarthy,* 336 U.S. 53, 57, 69 S.Ct. 413, 93 L.Ed. 497 (1949). As Judge Arnold of the Eighth Circuit paraphrased this standard:

In other words, when a motion for directed verdict or for judgment not withstanding the verdict is made, the court must assume that all of the evidence supporting the party opposing the motion is true, and must, in addition, give that party the benefit of all reasonable inferences drawn from that evidence. The case may be taken from the jury only if no rational jury could find against the moving party on the evidence.... Probably this formulation will result in fewer grants of motions for directed verdict than would result, if judges were free to take cases from the jury because of what they view as very strong evidence supporting the moving party. Occasionally verdicts may be returned with which judges strongly disagree. This is a price, we think, worth paying for our jury system, which is enshrined in the Bill of Rights and sanctified by centuries of history.

*Doce v. ACF Indus., Inc.,* 722 F.2d 374, 376–77 (8th Cir.1983) (footnote omitted).

Mendoza's testimony, viewed in the light most favorable to her and with all reasonable inferences drawn in her favor, was that on a daily basis, she had to work in an atmosphere where the plant's highest ranking executive was always after her. In 79 pages of transcript, Mendoza detailed the conduct of her supervisor throughout the year during which Page was her supervisor. In summary, she asserted that he (i) constantly followed her; (ii) continuously stared at her in sexual manner, looking her body up and down; (iii) on two occasions, sniffed at her groin area; (iv) on one occasion just sniffed at her; (v) rubbed up against her; and (vi) made inappropriate comments which were sexual in nature. Specifically, Mendoza, testified that:

From the time Mr. Page came to the Miami plant, he *always* seemed to be wherever *I* was. If I was in the lunch room, he was there. If I was at a picnic table outside on a break, he was there. If I was at a picnic table outside on a break, he was there. He man was *constantly* watching me and following me around and looking me up and down, whether it was face to face with me or as I would get up from a lunch table or from the picnic table to walk away and back to the office.... He seemed to be me not around the office, but around the hallways in the plant. Okay? He was at a lunch table in the lunch room. He would be at a picnic table outside. And he would look me up and down, very, in a very obnoxious fashion. When I was face to face with him, when I would get up and walk away from these tables and areas, I could feel him watching me up and down.... This was a *constant* thing.

(Tr. Trn. at 24–27) (emphasis added). On cross examination, Mendoza was asked if the incidents of following were constant, or something which took place only two to four times. She replied:

[N]o, that was a *constant* thing from the time he walked into the plant.... It was a *constant* thing.

(Tr. Trn. at 71) (emphasis added).

In addition to the staring and following, Mendoza described Page's actions in staring and sniffing at her groin area. She testified that while she sat at the copy machine,

I felt somebody watching me. I looked directly to my right. He was sitting at a chair in the conference room, which is approximately 20, 25 feet away from me, at a chair at the end of the table. And he looked at me up and down, and stopped in my groin area and made a (indicating) sniffing motion.

(Tr. Trn. at 27). Mendoza testified that another time, when in Page's office seeking permission to leave work because of the flu,

[He] turned around to his right, looked directly at me, up and down, and stopped again in the groin area, made a sniffing motion again, (indicating), like that.

(Tr. Trn. at 27). He then rejected her request, and when asked if she recalled the expression on his face, Mendoza said, "He was intense.... He was staring at me...." (Tr. Trn. at 27).

The majority suggests that the sniffing was not necessarily motivated or, as the majority puts it, "gender related" but could have been totally innocent conduct.[1] Indeed, it may have been innocent, and the jury may well have agreed with the majority's view. However, the jury was equally entitled to believe Mendoza's perception that it was sexually motivated, and directed at her in order to intimidate and harass.

It was obvious to me.... The man look me up and down, stop in my groin area. He was looking right at me, directly at me. It was obvious to me, it was at me.

MENDOZA v. BORDEN, INC.    565

This happened twice, stopped in the groin area and (indicating) made the sniffing (Tr. Trn. at 34–35). She further testified to Page's comment on another occasion which she found offensive and consistent with the sniffing incidents, "You're just like me, always sniffing around." (Tr. Trn. at 76). When asked whether it could have been an innocent comment, she said that she "most certainly" thought it a sexual comment. "I have never heard a completely(ly) innocent comment like that," she testified. (Tr. Trn. at 76).

After describing the incident in which Page rubbed his hip against her, Mendoza testified that, "I was startled. I looked over and he had a smile on his face, right, had a smile on his face, like he was enjoying himself." (Tr. Trn. at 73). When asked if she had never put her hands on someone's shoulders when passing them to prevent them from being startled, Mendoza responded, "I may have, but not rubbed my hips up against people." (Tr. Trn. at 73).

Mendoza testified that Page was "coming on to me, flirting with me." (Tr. Trn. at 29). Indeed, it may have been angry and disgusted at this.... "I went into his office angry and disgusted at this.... When Page turned around and I said to him, I came in here to work, period. And his reply to me was, 'yeah, I'm getting fired up, too.'" (Tr. Trn. at 29). When asked whether Page's comment—"I'm getting fired up, too"—was necessarily sexual in nature, she said, "I took those words to be his response to what I was saying to him. And he knew what I was talking about." (Tr. Trn. at 29). Similarly, she testified that they way he says only "indicating" as to the sniffing motion.

1. Of course, the majority is unable to evaluate what Mendoza described through her actions before the jury as there is no videotape of the trial testimony. An appellate court is unable to observe the witnesses' body language, the tone of expression, demeanor, and what her gesture indicated—an exaggerated lewd sniffing, a mere allergy-induced sniffle, or something else.

smiled at her "along with other things," was inappropriate. (Tr. Trn. at 69), and that when she "put it all together, I realized what was going on . . . . He was, his advances to me were definitely sexual in nature." (Tr. Trn. at 68).

Crediting Mendoza's account of the frequency and intensity of Page's unrelenting stares and looks, together with her allegations of his more egregious sexual conduct, such as overtly sniffing and looking at her groin area, it simply cannot be said that, "no reasonable and fair-minded persons . . . might reach different conclusions" as to whether Red Mendoza suffered sexual harassment. Of course, it is possible that a reasonable person might conclude, based on the totality of the evidence, that Mendoza's workplace environment was neither hostile nor abusive. The jury may not have believed that the incidents occurred. The jury may have drawn different inferences, but they may have drawn different conclusions from them. Or the jury may have determined that a reasonable person would not have found the environment to be hostile. The point is that it was within the jury's province to decide and not within an appellate court's. This record cannot support a conclusion that "[t]he facts and inferences point so overwhelmingly favor the verdict that no reasonable juror could reach a contrary decision." Bivens Gardens, 140 F.3d at 905 (quoting Hibiscus Assoc., 50 F.3d at 920).

## II. THE TESTIMONY MUST BE VIEWED IN ITS TOTALITY, AND NOT DISAGGREGATED INTO SEPARATE ACTS

As noted, an objectively hostile sexual environment is "an environment that a reasonable person would find hostile or abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (emphasis added). Under the law, that means, as common sense would likewise tell us, that the district court erred in requiring plaintiff to establish a claim as to each allegation of harassment; see Draper v. Coeur Rochester, Inc., 147 F.3d 1104, 1109 (9th Cir.1998) ("Discriminatory behavior comes in all shapes and sizes, and what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender.").

> [T]he analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes. "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario." It follows naturally from this proposition that the environment viewed as a whole may satisfy the legal definition of an abusive working environment although no single episode crosses the Title VII threshold.

Robinson v. Jacksonville Shipyards, Inc., 760 F.Supp. 1486, 1524 (M.D.Fla.1991) (quoting Andrews v. City of Philadelphia et al., 895 F.2d 1469, 1484 (3rd Cir.1990)).

This Court validated this approach in holding that "[a] hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits," making it improper to "examine each alleged incident of harassment in a vacuum." Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510-11 (11th Cir.1989).

The Supreme Court expressed the same principle in Harris, 510 U.S. at 23, 114 S.Ct. 367, saying that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." Most recently, it was amplified by Justice Scalia writing for a unanimous court in Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998):

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

Although the majority acknowledges that courts must look to the "totality of the circumstances," it repeatedly fails to adhere to the legal requirement that it is the context in its totality and not each incident in isolation that courts are required to examine when considering Title VII claims. To reduce the impact of the evidence in support of Mendoza's hostile environment claim, the majority first separately considers Mendoza's testimony that she was constantly followed and then simply eliminates consideration of that testimony.

The majority suggests that following and staring are behaviors categorically exempt from the reach of Title VII because they are ambiguous in meaning, and somehow would create a lower "baseline" for sexual harassment claims. The majority then concludes that, "aside from Page's constant following and staring, the conduct asserted by Mendoza was not frequent," and that "frequency of the harassing conduct—is also for the most part lacking." (Maj. Op. at 540 (emphasis added).

There is no question that being followed and stared at may be innocuous. On the other hand, it may very well constitute a violation of Title VII. Such a determination must depend on the circumstances. The act of walking behind someone cannot be determined by itself to be either bad or good, malicious or benign, actionable or not. The circumstances necessarily dictate how it must be characterized. Can it be characterized as simply two people walking serially toward the same destination? Can it be characterized, as the majority suggests, simply as an employer "keeping an eye" on an employee? Or can it be characterized as stalking?[2] The various possibilities illustrate the necessity of examining alle-

---

2. Indeed, Mendoza's allegations could constitute the crime of stalking as it is defined in most jurisdictions. For example, Florida's statute criminalizes any repeated following, whether or not accompanied by a threat: "Any person who willfully, maliciously, and repeatedly follows or harasses another person commits the offense of stalking, a misdemeanor of the first degree . . . ." Fla. Stat. § 784.048(1) (West 1992).

gations of being followed in the context of older incidents alleged. The claim here is not one based on simply being followed. From Mendoza's testimony, were it to be credited, it is a claim of being "constantly" followed—which in any lexicon can only mean all the time and, certainly, frequently—by someone who had sniffed at her groin area, leered at her by looking her "up and down," made innuendos ("I'm getting fired up"), and, when the opportunity arose, rubbed his hip against hers.

The characterization of Mendoza's claim as one based on the "everyday observation of fellow employees" and as "a natural and unavoidable occurrence" arising out of "people working together in close quarters," is one way of viewing the evidence. (Maj. Op. at 539). As the majority points out, another credible interpretation is that following or staring "can betray romantic or sexual attraction." (Maj. Op. at 539). Perhaps Mendoza's supervisor was indeed only "keep[ing] an eye on" her. (Maj. Op. at 539). An equally reasonable but unmentioned possible interpretation, however, is that the staring and following were intended to harass, humiliate, or intimidate. The majority errs in crediting any one interpretation over the others, and does so, among other reasons, because it fails to view the staring and following in the context of the surrounding testimony. In making its choice of inferences from selected facts, the majority fails to "look only to the evidence and reasonable inferences which tend to support the case of a litigant. ..." Wilkerson, 336 U.S. at 57, 69 S.Ct. 413.

3.  As Justice Scalia wrote for a unanimous court in Oncale:

[Harassing] conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.

118 S.Ct. at 1002.

## III. REQUIREMENTS OF A SEXUAL HARASSMENT CLAIM

In addition to failing to view the facts as a whole, the majority compounds its mistakes by mistating and misapplying the law of sexual harassment.

### A.  The Purposes of Title VII

The Supreme Court has repeatedly recognized that the purpose of Title VII is to strike at the disparate treatment of men and women in employment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Employees of either gender may experience discrimination or harassment in a variety of different forms, one of which is unwelcome sexual advances.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e-2(a)(1). The Court in Meritor stated that this language was "not limited to 'economic' or 'tangible' discrimination," but that it "evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." 477 U.S. at 64, 106 S.Ct. 2399 (quoting Los Angeles Dept of Water & Power v. Manhart, 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978)). The Court went on to say that Title VII is violated "[w]hen the workplace is per-

meated with discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris, 510 U.S. at 21, 114 S.Ct. 367 (quoting Meritor, 477 U.S. at 65, 67, 106 S.Ct. 2399). As Justice Ginsburg noted in her concurring opinion in Harris:

The critical issue, Title VII's text indicates, is whether members of one sex are exclusively on a list of four factors which, in fact, were included by Justice O'Connor in Harris as a non-exhaustive list:

But we can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance....

Id. at 23, 114 S.Ct. 367 (emphasis added).

Assuming there are reasonable people who, while crediting Mendoza's version of the facts, would not think that staring at a woman in her groin area while making sexually suggestive sniffing noises is degrading, humiliating, and/or intimidating, it seems beyond peradventure that many reasonable people would indeed find it to be so.

### B.  Mendoza Sufficiently Alleged Impairment To Her Job Performance

In addition, the majority errs in contending that Mendoza's claim must fail because

she has not demonstrated any impairment of her job performance. As Justice Ginsburg noted in *Harris*:

To show that interference [with an employee's work performance], "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment." It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment altered working conditions as to "ma[k]e it more difficult to do the job." Davis concerned race-based discrimination, but that is not the analysis. . . .

510 U.S. at 25, 114 S.Ct. 367 (quoting *Davis v. Monsanto Chemical Co.,* 858 F.2d 345, 349 (6th Cir.1988)). Title VII "comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Id.* at 22, 114 S.Ct. 367. In response to Page's treatment, Mendoza complained to him: (Tr. at 29), and relayed her state of mind as a result of Page's conduct: "I was embarrassed, I was humiliated, I felt degraded." (Tr. at 38).

If credited by a jury, the totality of Page's conduct can create an inference that her gender was the motivating impulse for his behavior and strikes at the core of Mendoza's entitlement to a workplace free of discriminatory animus. In rejecting an assertion that the consequences of a hostile environment must be so severe as to affect one's psychological health, the Supreme Court erred in relying on whether the conduct "seriously affected

plaintiff's psychological well-being" or led her to "suffer[] injury." Such an inquiry may needlessly focus the factfinder's attention on concrete psychological harm, an element Title VII does not require. Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious.

*Harris,* 510 U.S. at 22, 114 S.Ct. 367 (internal citation omitted). Based on these Supreme Court pronouncements, Mendoza has presented sufficient evidence for a jury to consider her claim under Title VII.

*C. The Majority "Polices the Baseline" in Contravention of Congress' Direction*

At the heart of the majority's opinion is the view that the incidents endured by Mendoza simply weren't that bad, that she should just put up with them rather than bring a Title VII claim. The majority contends that directing a verdict for the defendant in this case will promote its goal of "polic[ing] the baseline for hostile environment claims." (Maj. Op. at 535). In support of the majority's project, the majority cites a number of cases which it claims "delineate a minimum level of severity or pervasiveness" necessary for Title VII violations. (Maj. Op. at 537). In so doing, the majority attempts to compare various lists of allegedly harassing conduct with that alleged by Mendoza.

Again, such an analysis ignores our duty to consider the incidents not in isolation or as a laundry list, but in context and in light of the totality of the circumstances. To rely on a string of cases—several of which reached rub-

---

er dubious results—is a serious mistake because the majority continues to eliminate context as a criterion. Each of these cases must be taken on the totality of their unique facts. These cases, when viewed in conjunction with the many other cases where the "bar" is as low or lower,[4] underscore that this is a matter for juries and not judges to decide as a matter of law.

The majority offers no substantiation for the claim—which underlies its argument—that juries will be unable to distinguish sexually threatening staring and following from "innocent looking" or merely crossing paths with a coworker. The Supreme Court does not appear to entertain its same doubts. Justice Scalia explained in *Oncale* that the requirement that allegedly harassing behavior must create "an environment that a reasonable person would find hostile or abusive" is "sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace . . . for discriminatory 'conditions of employment'." *Oncale,* 118 S.Ct. at 1003 (emphasis added) (internal quotation marks omitted).

This case comes to us for review of the district court's grant of a Rule 50 motion for judgment as a matter of law. "A motion for a directed verdict, or for a judgment notwithstanding the verdict under Rule of Civil Procedure 50, 28 U.S.C.A., raises a question of law only: Whether there is *any evidence* which, if believed, would authorize a verdict against movant. The trial judge in considering those motions does not exercise discretion, but makes a ruling of law . . . ." *Marsh v. Illinois Cent. R. Co.,* 175 F.2d 498, 500 (5th Cir.1949)[5] (emphasis added). In contravention of this clearly articulated judicial role, the majority repeatedly engages in its own assessments of the credibility and value of Mendoza's testimony. For instance, the majority concludes that Page's statement that he was "getting fired up" had no "sexual or other gender-related connotation," (Maj. Op. at 539). Moreover, the majority concludes that none of the conduct of which Mendoza complained was humiliating (Maj. Op. at 540)—in direct contradiction to her sworn statement that she in fact felt "humili-

---

4. *See Williams v. General Motors,* 187 F.3d 553 (6th Cir.1999) (overturning the district court's dismissal of plaintiff's complaints of "foul language, mean and annoying treatment by co-workers, sexually related remark," on grounds that the district court disregarded the plaintiff's claims . . . which robbed the incidents of their cumulative effect"); *Breda v. UPS, Inc.,* 151 F.3d 757, 762 (8th Cir.1998) (finding case "borderline" but holding allegations that supervisor "patt[ed] female employee on the butt," told her she smells "good" and "once told a female employee that a teddy bear, directing her to go to lunch with him, inviting her to go to Atlantic City with him] in this case presents an issue for the jury"); *Sandra Barna v. City of Cleveland,* 172 F.3d 47 (6th

Cir.1998) (affirming the district court's denial of a directed verdict motion because the "jury was free to conclude" that plaintiff was telling the truth regarding harassment including a constant stream of sexual comments, requests, and vulgar gestures occurring over a daily basis); *Curreo v. New York City Hous. Auth.,* 890 F.2d 569, 578 (2d Cir.1989) ("emphatically" rejecting defendant's argument that "harasser['s] conduct, though not consisting of only "two kisses, three touches, several distressing epithets and objectionable—but ultimately harmless—conduct").

5. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

**572   MENDOZA v. BORDEN, INC.**

ated" (Tr. Trn. at 35). Further, the majority dismisses Mendoza's allegations that Page harassed her by constantly following her and staring at her, preferring instead to infer that Page "simply showed up when Mendoza happened to be in the hallways, in the lunch room, or at the picnic table outside." (Maj. Op. at 541). These explicit credibility determinations and factual interpretations are clearly far outside this Court's appropriate role at this stage of Mendoza's litigation. Indeed, it is our duty "to review all of the evidence in the light most favorable to, and with all reasonable inferences drawn in favor of" Mendoza. *Rivera,* 140 F.3d at 905. By making these determinations and drawing these inferences, the majority has usurped the traditional role of the rightful finder of fact.

In the Civil Rights Act of 1991, Congress specifically amended Title VII. Having from its inception in 1964 charged the court with the task of deciding whether actions alleged by discrimination plaintiffs constituted a violation of Title VII, Congress changed its mind in 1991 and specifically provided all plaintiffs seeking compensatory or punitive damages with the right to have his or her case heard before a jury. 42 U.S.C. § 1981a(c)(1). The mistrust of juries evidenced by the majority is at odds with the specific directive of Congress that the jury is to decide whether gender discrimination has occurred in the workplace. In concluding that plaintiffs seeking compensatory and punitive damages should have the right to seek a jury determination of their claims, Congress reasoned that "[t]he jury system is the cornerstone of our system of civil justice, as

evidenced by the Seventh Amendment's guarantee. Just as they have for hundreds of years, juries are fully capable of determining whether an award of damages is appropriate and if so, how large it must be to compensate the plaintiff adequately and to deter future repetition of the prohibited conduct." H.R.Rep. No. 102–40(I), 72 (1991) (footnote omitted), *reprinted in* 1991 U.S.C.C.A.N. 549, 610.[4]

Civil juries traditionally have been charged with the task of deciding all questions of fact where reasonable people might credit different versions of the facts presented, thereby differing as to the proper resolution of the ultimate question in the case. As in other contexts wherein the jury is charged with applying a "reasonable man" standard, allowing jurors to decide the question of reasonableness as to Title VII issues is precisely what Congress intended. *Cf. Smith v. United States,* 431 U.S. 291, 302, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977) ("it would be just as inappropriate for a legislature to attempt to freeze a jury to one definition of reasonableness as it would be for a legislature to try to define the contemporary community standard of appeal to prurient interest or patent offensiveness . . . ."); *id.* ("A juror is entitled to draw on his own knowledge of the views of the average person in the community or vicinage from which he comes . . . .") (internal quotation marks omitted).

Because I believe the majority has not only misinterpreted but misstated the law of sexual harassment and has arrogated to itself the jury function in violation of our legal precedent and Title VII's specific entitlement to a jury's verdict, I dissent.

6. The legislative history of the Civil Rights Act of 1991 is extremely limited. Most of the discussion that led to the compromise statute took place in closed door discussions between the Bush White House and Congressional leaders.

*See* Douglas C. Herbert & Lani Schweiker Shelton, *A Pragmatic Argument Against Applying the Disparate Impact Doctrine in Age Discrimination Cases,* 37 S Tex. L.Rev. 625, 652 n. 147 (1996).